**REFRIGERATED TRANSPORT CO., INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 75–4259.

United States Court of Appeals, Fifth Circuit.

May 27, 1977.

---

Alan E. Serby, Atlanta, Ga., for petitioner.

Alan J. Thiemann, Arthur J. Cerra, Gen. Counsel, Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Dept. of Justice, Catherine G. O'Sullivan, Atty., Washington, D. C., for respondents.

William H. Towle, Chicago, Ill., for Midwest Emery Freight System, et al.

Before AINSWORTH and CLARK, Circuit Judges, and HUGHES,* District Judge.

CLARK, Circuit Judge:

As regards review jurisdiction by this court of appeals, the Interstate Commerce Commission is the new-kid-on-the-block.[1] If this case is to be any gauge, a compatible relationship will be slow to develop. Practice before the ICC is strongly oriented to form—form which is described in idioms as foreign to us as the notion that substance is not paramount. Today's dispute concerns the effect of recent rules designed to save energy by eliminating round-about routings and their application to a carrier whose purchase of additional operating rights was in the process of approval when the new rules became effective. The carrier contests the ICC's refusal to allow it to handle shipments between points it already served and points on the routes purchased. We affirm the denial of that authority.

The matter comes to us on a petition for review of ICC orders filed by Refrigerated Transport Company, Inc. (Refrigerated), an interstate motor common carrier of perishable food products. Refrigerated filed with the ICC a "gateway" elimination application in which it sought (a) approval of "tacking" of its previously authorized authorities to operate motor carrier routes onto the authorities recently acquired through the purchase of Florida Refrigerated Service, Inc. (Florida Refrigerated), and, (b) that the "gateways" resulting from this approved tacking be eliminated.[2]

Notice that Refrigerated was applying for elimination of gateways was published in the *Federal Register* without any reference to its underlying request for tacking approval. ICC Review Board Number 1 denied both requests in Refrigerated's application, and ICC Division 1, acting as an appellate division, denied Refrigerated's petition for reconsideration. This appeal resulted.

Our review follows these usual constraints:

It is the general rule that the scope of judicial review of decisions of the Interstate Commerce Commission within the area of its expertise is narrow and extends only to questions affecting the constitutional power, statutory authority and warrant in the record for its determination, ascribing its findings the weight due to the judgment of an expert body. It will be presumed that the Commission properly performed its duties. This pre-

---

* Senior District Judge of the Northern District of Texas, sitting by designation.

1. 28 U.S.C. § 2321 (Supp.1976), vesting jurisdiction in United States Courts of Appeals, was enacted January 2, 1975, to replace three-judge procedures formerly provided by 28 U.S.C. § 2321, *et seq.* (amended 1975).

2. These terms were defined by the ICC in its Notice of Proposed Rulemaking opinion, Motor Common Carriers of Property, Routes & Services, 119 M.C.C. 170, 171 (1973):

A gateway results from a motor common carrier combining or "tacking" two separate and unrestricted grants of irregular-route authority at a service point common to each— the gateway point—and conducting operations through the gateway from points served under one authorization to those served in the other.

Irregular route authority permits a carrier's operations to be conducted along any route joining the authorized service areas. Regular route authority, conversely, limits operations to predetermined routes between fixed points.

sumption attaches in the absence of clear evidence to the contrary.

*United States v. Central Truck Lines*, 548 F.2d 523 (5th Cir. 1977). The Administrative Procedure Act, 5 U.S.C. § 706 (1967), gives us these further standards:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency actions, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.

The background for the controversy in the present litigation was set in the proceedings instituted by Refrigerated pursuant to 49 U.S.C. § 5(2) (1959), seeking ICC approval of its merger by purchase with Florida Refrigerated. In that section 5 case, the administrative law judge found the merger to be in the public interest and this finding was affirmed by ICC Division 3. The merger was completed in the summer of 1974, but no certificate had been issued at the time of filing the present suit. Refrigerated complains that its decision to purchase Florida Refrigerated and merge the operations of the two companies was prompted in large measure by the anticipated benefits of joining the authorities issued to each carrier so that it could provide through service between points on existing and newly purchased routes. Of the $1,200,000 purchase price, Refrigerated avers that fully $500,000 was attributable to the estimated benefit of the joinder of authorities.

This appeal must deal with two broad issues. First, was tacking by Refrigerated already authorized by the ruling in the section 5 merger case, or at least should tacking have been considered in the present gateway elimination case? Second, was gateway elimination properly refused? Though the tacking question presents myriad problems of interpreting ICC regulations and opinions, the resolution of most of them becomes academic in light of our conclusions that gateway elimination was properly denied. Because some aspects of tacking have limited ramifications for our decision, we will catalog the approaches taken by the parties and discuss the relevant questions. Before reaching these basic issues, we will deal briefly with two related subjects.

■ The ICC does not question that before the gateway elimination rules of November 23, 1973, it almost certainly would have permitted Refrigerated to "tack" the separate routes of the two companies. However, the existence of this probability under prior regulations does not control the outcome of today's decision. No carrier has a vested interest in the continuation of existing procedures. Changes in conditions may produce new regulatory standards which deny Refrigerated the benefits it had anticipated when entering into merger negotiations with Florida Refrigerated.

We are fully aware that in economic and managerial terms it is the prospect of tacking that inspires the bulk of applications under § 5 for transfer [of the rights

of a merged carrier]. Nevertheless, as the *Thompson*[3] opinion shows, the acquisition of tacking rights is a policy of the Commissioner rather than an absolute right of the transferee . . . .

. . . Carrier freedom is not as complete as it was prior to the [Gateway Elimination] order before us, and doubtless there will be some instances of what will prove to be unnecessary burdens and perhaps unsound action. On the other hand, this is not an unreasonable price to pay to gain the advantage of the regulations, taken in the large, of fuel savings and other benefits from avoidance of circuity.

*Common Carrier Conference, etc. v. United States*, 175 U.S.App.D.C. 244, 534 F.2d 981, 983 (1976) (footnote added).

█ We reject the contention that merely due to previous authorization to conduct certain operations, Refrigerated might now be entitled to "grandfather" consideration. Refrigerated refers to various changes in statutory methods of certification of carriers previously made in which Congress or the ICC provided that carriers already conducting operations would not lose their authorities because of the new rules. It is contended that the ICC in the *Gateway Rulemaking* opinion, Motor Common Carriers of Property, Routes & Service, 119 M.C.C. 530 (1974), extended similar grandfather protection. This is based on the statement that in judging whether elimination of a specific gateway would be permitted, no greater burden of proof would be imposed " . . . than that governing regular elimination of gateway applications, but will be somewhat more akin to the standard 'grandfather' procedures utilized

by this Commission in the past." *Id.* at 550. This burden of proof proviso is not a mandate that every carrier then utilizing gateways or tacking will be entitled either to continue or get gateway elimination benefits. The *Gateway Rulemaking* case and the public interest in resolving the energy crisis which compelled gateway rules indicate that the use of circuitous routes must stop. The normal grandfather considerations for continuing past practices are antithetical to the purpose of these rules and grandfather protection was correctly rejected by the Commission.

## TACKING

Refrigerated complains of the ICC's failure to publish any reference to its claim of the right to tack when notice of the proceeding to eliminate gateways was published in the *Federal Register.* The ICC argues that it was proper to refuse to publish the request for tacking because Refrigerated was seeking to eliminate gateways, not create them. The ICC contends the proper approach for Refrigerated if it wished authority to tack was to seek a modification of its existing certificate under the provisions of ICC Rule 102, 49 C.F.R. § 1100.102 (1975), by attempting to reopen the section 5 case involving the purchase and merger of Florida Refrigerated.[4] The ICC also argues Refrigerated cannot now complain since it did not even inquire about the form of the publication until it moved for reconsideration of the ICC decision.

Refrigerated's position is that the rules under which it filed, though related to gateway elimination proceedings, also entitled it to consideration of the underlying and re-

---

3. *Thompson Van Lines v. United States*, 399 F.Supp. 1131 (D.D.C.1975) (three-judge court), *aff'd per curiam*, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976). .

4. § 1100.102 Petitions not otherwise covered. (Rule 102)

   When the subject matter of any desired relief is not specifically covered by the rules in this part, a petition seeking such relief, and stating the reasons therefor, may be served and filed.

On February 24, 1977, ICC Division 3, acting as an· appellate division, granted authority to tack in a reopened section 5 proceeding to approve transfer of operating rights. *Hughes Refrigerated Express, Inc., et al., Transferee,* No. MC–FC–75879 (Service Date March 21, 1977). The extent of circuity involved in the tacking is not shown. Just how it will avoid the impact of *Gateway Rulemaking,* or if it can, is not discussed. However, the opinion does note it will become effective in the absence of objection.

lated contention that tacking had been approved in the purchase proceeding. It relies on this extract from the *Gateway Rulemaking* opinion, *supra* at 553–4.

> Many persons suggest that these rules [those codified in 49 C.F.R. § 1065.1] should not apply to authority issued by us as a result of an application filed prior to the effective date of these regulations . . . .. Authorities issued as a consequence of applications filed before November 23, 1974, *which might otherwise permit tacking* in excess of 20 percent will not authorize such tacking unless the application applies for elimination of the resulting gateway *either under the special application procedure here adopted or otherwise.* The direct authority so sought will be issued upon a clear finding on the record in each proceeding either (1) that the service through the gateway point has been performed (this might be done by demonstrating participation in deteriorating interline or interchange services on the cut-off date, . . .) or (2) that a public need for such a through service exists. [Emphasis supplied.]

Refrigerated focuses on the "or otherwise" language and argues that the breadth of alternatives thereby offered by the ICC to carriers certainly encompassed including a request for tacking in the gateway elimination application itself. The ICC counters that the quoted words and other language relied upon by Refrigerated solely relates to requests for elimination of gateways. The

problem of whether tacking approval can be considered in a gateway elimination proceeding is intertwined with an analysis of the regulations themselves.

Because a gateway seldom lies on the most direct route between a point served under one authorization and a point served on another, the requirement that a shipment between such points proceed through the gateway would usually require that the shipment travel a circuitous route. When the energy crisis was recognized in 1973, the ICC decided to respond by altering its previously liberal permission of gateway operations with their attendant fuel wastage. Notice of Proposed Rulemaking, Motor Common Carriers of Property, Routes & Services, 119 M.C.C. 170 (1973). The new procedures were outlined in *Gateway Rulemaking* and duly issued as regulations. 49 C.F.R. § 1065.1 (1975).

The scheme envisioned by the new gateway policy has two levels which are pertinent here. They deal with carriers who are providing service through gateways or had applications for such service pending at the time the new policy was adopted.[5] Those carriers with applications for merger pending on the date of the gateway policy are treated only somewhat differently from those already providing service. The two levels of this policy are distinguished according to the amount of deviation which the use of the gateway would cause. If circuity in the routes to be joined does not exceed 20%, the carrier is entitled to tack-

---

**5.** Even though we have rejected Refrigerated's arguments that it is entitled to "grandfather" authorization for service provided in the past, we note here that the ICC has taken considerable pains to give those with existing interests and investments in services certain consideration not offered to newcomers. The codification of the provisions for tacking and gateway elimination established in *Gateway Rulemaking* only deals with existing services. This is due to the ICC's decision that tacking of newly issued authorities will not be permitted. *Notice of Proposed Rulemaking, supra* at 197. Instead, certificates issued under newly-filed petitions for merger of authorities are to state expressly either that no tacking will be permitted or else a certificate will be issued granting direct operating authority between points.

*Gateway Rulemaking, supra* at 552–53. Thus, there will not arise any tacking or consequent need for gateway elimination.

It is not possible for us to discern whether the ICC has modified this approach or was merely inexact in its choice of words. Later pronouncements indicate that tacking may be expressly authorized in a future section 5 merger case. *See* Gray Moving & Storage, Inc.,—Purchase (Portion)—Warner, 122 M.C.C. 316, 329 (1976); Policy Statement concerning Ex Parte No. 55 (Sub. No. 8) (Dec. 4, 1974) at 2. We need not resolve the apparent inconsistency to decide the present appeal. We only note that such tacking authority will only be granted when accompanied by an application to eliminate resulting gateways. *Id.*

ing and gateway elimination on essentially the same basis as a carrier with similar existing service. If the circuity exceeds 20%, then the applicant must indicate that a history of interline or interchange service through the gateway point exists (to prevent the creation of competition for existing carriers through utilization of the gateway rules), or show a public need. With this initial presentation, the carrier must then indicate that his proposed service meets the public convenience and necessity tests. *Id.* at 553–54. Both parties implicitly treat the routes Refrigerated sought to tack as exceeding the 20% circuity limit.

The clear intent is to put the onus on those carriers whose operations involve more than 20 percent circuity of indicating their entitlement to direct service, *i. e.,* service which bypasses or eliminates a gateway.

> We do not, however, intend to affect adversely those carriers that may currently be providing adequate circuitous services requiring tacking of over 20-percent greater mileage than the most direct route in a manner fully competitive with direct-line carriers. Such carriers will be allowed, under the regulations here proposed, to continue their operations if they file an appropriate application for direct operating authority from and to the points they serve  .   .  ..

*Notice of Proposed Rulemaking, supra* at 194–95. Similarly, those carriers with pending applications for service would be permitted to tack even if circuity was greater than 20-percent, if gateway elimination was sought and the proper evidentiary demonstration made. "If a need to tack can be shown" in the section 5 case, then the ICC "will grant the operating authority directly between the points that could be served by the tacking." *Gateway Rulemaking, supra* at 553.

The ICC summarized the intent of its new regulations by stating no tacking would be permitted when (a) present authority or pending applications involved routes with more than 20% excess mileage,

or (b) as to any future applications. *Notice of Proposed Rulemaking, supra* at 195–96. The result of these regulations is to require that a carrier providing proscribed service (or one who seeks such authority under a pending application) successfully prosecute his gateway elimination application or lose any right to tack. *Gateway Rulemaking, supra* at 537, 538. Thus permission, express or tacit, to tack authorities involving over 20% circuity means little and loses its effectiveness altogether without the subsequent approval of gateway operations. This basic regulatory framework was approved in *Thompson Van Lines v. United States,* 399 F.Supp. 1131 (1975) (three-judge court), aff'd per curiam, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976).

However, the gateway elimination rules recognize the possible need for exceptions in unusual circumstances. In *Gateway Rulemaking, supra,* the ICC stated that even though a gateway is eliminated, this does not always require terminating operations through the gateway point:

> The carrier may apply for direct authority and, if granted, may operate through its former gateway if this would be more economical.[8]
>
> [8] Direct authority does not, without more, require the holder to operate over the most direct highways in providing the authorized service. Rather, the carrier may operate from, to, or between its authorized service points by the most efficient and practicable routing given the requirements of its own operations.

*Id.* at 541. Gateway elimination if approved may entitle the carrier to utilization of totally new routes, yet it also may involve operations along the same routes that tacking previously allowed. What is significant for today's decision is not that there are exceptions to the rules, but that gateway elimination proceedings, not tacking, must form the mode for consideration.

The ICC has interpreted its own regulations dealing with filing procedures for gateway elimination, 49 C.F.R. § 1065.1 (1975), as not permitting requests for tacking. The construction placed on rules and

regulations by the promulgating agency is entitled to great weight and is to be discounted only if clearly unreasonable. *Udall v. Tallman,* 380 U.S. 1, 95 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Roy Bryant Cattle Co. v. United States,* 463 F.2d 418 (5th Cir. 1972). In light of the inconsistency of purpose in gateway elimination and tacking, it was reasonable for the Commission to conclude that tacking authority could not be established in a gateway elimination proceeding. Therefore, the ICC properly refused to consider Refrigerated's request for tacking authorization in the present case.

Prior to the institution of the present proceedings before the ICC, Refrigerated had received a determination by the administrative law judge who approved the section 5 merger of Refrigerated with Florida Refrigerated that it was in the public interest that the certificates of the two carriers be joined for through operations. Though we agree with the ICC that the judge was making his comments in the context of a controversy concerning certain duplicated rights held by Refrigerated, his reason for not permitting this matter to bar the merger was that through service "was in the public interest." [6]

■ Although questions are raised as to whether the determination of the administrative law judge was carried over into the ICC decision on the matter, a determination that tacking authority already existed would still avail Refrigerated nothing here. Regardless of such prior authorization of tacking, a carrier may not persist in conducting operations through a gateway when a direct route would result in savings of more than 20% of the mileage through the gateway. Instead, an application for gateway elimination must be filed and authority

to conduct direct operations must be secured. 49 C.F.R. § 1065.1(b). Since we find that the ICC properly determined that Refrigerated failed to prove that it was entitled to eliminate the gateways created by its purchase of Florida Refrigerated, it matters not whether Refrigerated already held the right to join these routes. We therefore proceed to explain our holding on this definitive issue.

## GATEWAY ELIMINATION

■ The ICC denied Refrigerated's request to eliminate eight separate gateways created by the section 5 case merger of authorities already held with those purchased from Florida Refrigerated. As it had from the outset of the new gateway elimination rules, the ICC applied here the standards adopted in *Childress—Elimination Sanford Gateway,* 61 M.C.C. 421 (1952). *Gateway Rulemaking, supra* at 550. This meant that in the absence of testimony by public witnesses in favor of the gateway elimination, the carrier must indicate:

(1) whether it is transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway, and in so doing is effectively and efficiently competing with the existing carriers, and

(2) whether the elimination of the gateway would enable the carrier to render a service so different from that presently provided as to improve materially the carrier's position to the detriment of existing carriers.

*Childress, supra* at 428. Since what is being sought is a new certificate encompassing service that does not respect the gateways, the standards of 49 U.S.C. § 307 (1963) also

---

6. Although the issue is not free from doubt, it appears that the ICC intends to apply differing standards to approval of tacking as a part of section 5 proceedings and to elimination of gateways under its new rules. *Gateway Rulemaking, supra,* at 554, clearly indicates that public convenience and necessity must be shown to support tacking. *Gray Moving and Storage, supra,* and *Hughes Refrigerated Express, supra* at n.3, indicate that the less exacting standard of public interest will continue to apply to the approval of tacking in pending or reopened merger proceedings under section 5. (But note the dissent of Commissioner Clapp in *Hughes.*) This apparent difference in standards could be another reason supporting the ICC's insistence on bifurcating tacking and gateway elimination. It is unnecessary for us to decide what standard will apply to tacking and we decline to do so.

must be met, requiring that the public convenience and necessity support the requested action. *Gateway Rulemaking, supra* at 554.[7]

The only evidence supplied by Refrigerated in the gateway elimination proceedings was a traffic abstract of service it had rendered through the gateways in 1974. The ICC determined that this evidence was inadequate because 49 C.F.R. § 1065.-1(d)(2)(ii)(B) provides evidence must be adduced as to through service for the two years immediately preceding November 23, 1973, the date of the new gateway elimination policy. According to the ICC, the purpose of having evidence that predated the gateway elimination rules was to avoid the attempted use of the new regulations to establish service that was not being conducted before the advantages of the new policy were announced. *See Gateway Rulemaking, supra* at 543, 550. Refrigerated responds that it was not the operator of the service at that time since Florida Refrigerated was the carrier until completion of the section 5 proceedings. However, § 1065.-1(d)(2)(iii) provides for evidence during the two-year period of operations either of the carrier applying for gateway elimination "or its established predecessor-in-interest." Thus Florida Refrigerated's service through the gateways during the relevant period was proper evidence which should have been supplied.

Moreover, the ICC determined that even considering the evidence submitted, there was an inadequate showing under the *Childress* criteria for having the gateways eliminated. The ICC determined that the evidence was both insufficient and defective. Such of the evidence as was usable did not compel a finding of public convenience and necessity, and the remainder of the evidence was too imprecise to permit any conclusions. The determinations were sound. The refusal to grant gateway elimination authority to Refrigerated was not in error.

Being in accord with the Administrative Procedure Act standards, the determinations of the ICC are

AFFIRMED.

---

**7.** Refrigerated refers us to *Blodgett Uncrated Furn. Serv. v. United States,* 288 F.Supp. 591 (D.Mich.1968), but this case does not indicate that the *Childress* standards are inapplicable.