585 F.2d 783
 NORTH ALABAMA EXPRESS, INC., and Hiller Truck Lines, Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Floyd & Beasley Transfer Company, Inc., Intervenor-Respondent.
 No. 77-3252.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 8, 1978.
 
 George M. Boles, John P. Carlton, Birmingham, Ala., for petitioners.
 Griffin B. Bell, Atty. Gen., Dept. of Justice, Mark Evans, Gen. Counsel, ICC, Wayne M. Senville, Atty., ICC, John P. Fonte, Atty., ICC, Peter L. de la Cruz, Atty., Dept. of Justice, John J. Powers, III, Washington, D. C., for respondents.
 Charles Ephraim, James F. Flint, Washington, D. C., for Floyd & Beasley Transfer.
 On petition for review of an order of the Interstate Commerce Commission.
 Before COLEMAN, CLARK and RUBIN, Circuit Judges.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 This appeal is from an order of the Interstate Commerce Commission granting increased operating authority to the Floyd & Beasley Transfer Company, Inc. ("Floyd"), a motor common carrier. The grant of new authority to Floyd is challenged by two of Floyd's competitors, North Alabama Express, Inc. ("NAE") and Hiller Truck Lines, Inc. ("Hiller") on both substantive and procedural grounds. The appellants challenge the sufficiency of the evidence supporting the Commission's order, attack on policy grounds the grant's authorization for the use of private plantsites as joinder points for Floyd's operations, and allege that the notice of Floyd's application published in the Federal Register was incomplete and thus fatally defective. Finding that the published notice was inadequate to alert interested persons to the true nature of the application, we remand to the Commission on that ground for corrected republication and an opportunity for interested persons to be heard.
 
 I.
 
 2
 Floyd is a trucking firm operating as an interstate common carrier in the four-state area of Alabama, Georgia, South Carolina and Tennessee. Floyd transports goods under both "regular route" and "irregular route" authorities. Regular route authority limits operations to predetermined routes between fixed points. Irregular route authority permits a carrier's operations to be conducted along any route joining authorized service areas. In an application filed on December 3, 1973, Floyd sought to enlarge its existing service by obtaining new regular route authority. The authority sought would have enhanced Floyd's operation by extending Floyd's service to certain specified points in Mississippi and by increasing the types of service it could perform within its existing four-state area. The expansion within Floyd's existing service area was to be accomplished in part through the "tacking," or joinder, of the new regular route authority sought with its already held regular and irregular route authorities.[1]
 
 
 3
 Floyd's application progressed through the normal stages outlined in the Commission's rules. See 49 C.F.R. § 1100.247. As required in 49 C.F.R. § 1100.247(c), notice of Floyd's application was published in the Federal Register on April 11, 1974. The application was amended on September 18, 1974, and notice of the application's amended form was published in the Federal Register on October 17, 1974. In both publications in the Federal Register, the notice consisted of a virtually verbatim duplication of the geographic description of the authority sought in Floyd's applications. The published notice was essentially a lengthy and complex geographic description, detailed in terms of highway route numbers and cities, explaining the exact route over which Floyd's trucks would travel if the application were granted. The notice also included an equally complicated list of detailed restrictions on the authority sought. Both publications of notice, however, failed to include the final sentence of the description of the authority sought as that description was printed in Floyd's application. The final omitted sentence stated that the authority sought in the application would be tacked with Floyd's existing authorities at Vincent and Rockford, Alabama.
 
 
 4
 Commission procedure requires that any person wishing to contest an application file a "protest" with the Commission within 30 days of the date of Federal Register publication. 49 C.F.R. § 247(e)(1). If the merits of the application are slated for oral hearing, protestants are normally allowed to present evidence and cross-examine witnesses as full parties. The failure to file a protest within 30 days of Federal Register publication, however, is regarded by the Commission "as a waiver of opposition and participation in the proceeding." 49 C.F.R. § 247(e)(2). The Commission's rules further provide that no person who fails to file a protest within the 30-day period "will be permitted to intervene in opposition in a proceeding except upon a showing of substantial reasons." 49 C.F.R. § 1100.248(i).
 
 
 5
 Protests contesting Floyd's application were seasonably filed by 22 motor carriers, including appellant Hiller. Floyd's application was slated for hearings before a Joint Board at Montgomery, Alabama, and the hearings commenced in September of 1976, with the protestant opposing carriers as participants.
 
 
 6
 The appellant NAE, however, did not file a protest within the 30-day time period. On August 14, 1975, five weeks prior to the opening of the Joint Board's proceedings in Montgomery, NAE filed a petition for leave to intervene. NAE's petition set forth NAE's interest in the proceeding, claimed that its intervention would not unduly lengthen the proceeding or enlarge the issues involved, and asserted that it had failed to comply with the 30-day requirement "inadvertently," citing the length and complexity of Floyd's application. NAE claimed that it sought intervention immediately upon discovering that Floyd's application involved operating authority duplicative of NAE's service.
 
 
 7
 The Joint Board denied NAE's petition to intervene, stating that it had not justified its failure to file a protest within 30 days of Federal Register publication with "substantial reasons." Proceeding to the merits, the Joint Board ultimately refused to grant the aspect of Floyd's application that would have extended its operations into Mississippi, but did grant the new authority sought within Alabama, thus allowing Floyd to expand its operations in its existing four-state area. The Joint Board's actions were affirmed by the Commission on October 25, 1977.
 
 
 8
 On appeal, NAE asserts that its adverse interest in Floyd's application exists only by virtue of Floyd's intent to tack the regular route authority sought in its application with its existing regular and irregular route authorities in Alabama. Because notice of Floyd's intent to tack was not included in the published version of Floyd's application, NAE asserts that it and other potentially interested parties were not apprised of the true nature of the application, and were thus improperly denied an opportunity to be heard. The appellants also challenge the practice of allowing tacking to occur at private plantsites, and generally attack the sufficiency of the evidence.
 
 II.
 
 9
 Reasonable notice to interested persons that their legally protected interests may be adversely affected by administrative action is a requirement of due process, the Interstate Commerce Act, the Administrative Procedure Act, and the Commission's own rules. Failure to provide adequate notice is a jurisdictional defect that invalidates administrative action until the defect is cured. Finding the published notice in this case inadequate to inform members of the public of the full scope of Floyd's application, we remand for republication in the Federal Register and an opportunity for interested parties to be heard.
 
 
 10
 The due process clause requires that notice be reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests. Walker v. City of Hutchinson, 352 U.S. 112, 115, 77 S.Ct. 200, 202, 1 L.Ed.2d 178 (1956); Covey v. Town of Somers, 351 U.S. 141, 146, 76 S.Ct. 724, 727, 1 L.Ed.2d 1432 (1956). In the administrative context, due process requires that interested parties be given a reasonable opportunity to know the claims of adverse parties and an opportunity to meet them. Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 442, 84 L.Ed. 656 (1940); Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938); Intercontinental Industries, Inc. v. American Stock Exchange, 452 F.2d 935, 941 (5th Cir. 1971). Sections 205(e) and 206(b) of the Interstate Commerce Act, 49 U.S.C.A. §§ 305(e), 306(b), explicitly embody this reasonable notice requirement. See Buckner Trucking, Inc. v. United States,354 F.Supp. 1210, 1219 (S.D.Tex.1973) (three-judge court); Pinkett v. United States, 105 F.Supp. 67, 71 (D.Md.1952) (three-judge court). The I.C.C. is also bound by the requirements of reasonable notice prescribed in the Administrative Procedure Act, 5 U.S.C. § 554(b). Buckner Trucking, supra at 1219; Refrigerated Transport Co. v. United States, 313 F.Supp. 880, 888 (N.D.Ga.1970) (three-judge court); Florida Citrus Commission v. United States, 144 F.Supp. 517, 521 (N.D.Fla.1956) (three-judge court). Finally, the Commission's own rules provide that:
 
 
 11
 Notice of the filing of applications to competitors and other interested persons will be given by the publication of a summary of the authority sought in the FEDERAL REGISTER. Such summaries will be prepared by the Commission, and it shall be the responsibility of the applicant promptly to advise the Commission if the summary does not properly describe the authority sought.
 
 
 12
 49 C.F.R. § 1100.247(c).[2] We must evaluate the adequacy of notice with "due regard for the practicalities and peculiarities of the case." Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); Intercontinental Industries, Inc. v. American Stock Exchange, 452 F.2d 935, 941 (5th Cir. 1971). "The notice must be of such nature as reasonably to convey the required information." Mullane, 339 U.S. at 314, 70 S.Ct. at 657; Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940); Grannis v. Ordean, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). The operative test is that "the notice as published must reasonably apprise any interested person of the issues involved in the proceeding." Buckner Trucking, supra at 1219.
 
 
 13
 The Commission advances three arguments in support of the sufficiency of the notice it provided concerning Floyd's application. It first asserts that the established policy of the Commission is to require published notice of tacking only when an applicant seeks Irregular route authority. The Commission states that when Regular route authority is sought, as was the case in Floyd's application, tacking is automatically presumed to be intended, and thus no formal notice of an intent to tack is needed. The Commission's second argument is that although the published notice left out the plain statement in Floyd's application that tacking was intended, the restrictions on the authority sought that were published as part of the notice disclosed by implication the intention to tack. The restrictions described in the published notice against certain service would not have been necessary unless the service was otherwise possible. Since the service was not otherwise possible in the absence of tacking, the Commission reasons that inclusion of the restrictions provided notice by implication that tacking was contemplated. Finally, the Commission claims that even if the published notice was not in itself sufficient to reveal Floyd's intentions, NAE's associations with Floyd as a "interlining" carrier[3] should have alerted it to Floyd's tacking intentions if NAE had been diligent in mapping out the routes and restrictions described in the Federal Register notice. All three arguments are unpersuasive variations on the same theme; they concede the threshold proposition that some form of notice of Floyd's intention to tack must be shown to sustain the Commission's order, but argue that as a practical matter the implied notice of tacking provided in this case was sufficient.
 
 
 14
 The Commission's principle argument, that intent to tack is automatically assumed in applications such as Floyd's, is not clearly established in past Commission policy. Floyd sought regular route authority which it intended to tack with existing regular And irregular route authority. The Commission's prior decisions indicate that in circumstances where regular and irregular route authority will be tacked, notice of tacking is necessary to alert interested parties of the true nature of the application. The Commission itself acknowledges at least two cases in point with the case before us in which the Commission has found notice defective when no intention to tack was revealed in regular route applications that were to be tacked with irregular authority. Bonanza Trucking Co., Ext. Gilsonite, 94 M.C.C. 620 (1964); Schuster Express, Inc., Ext. Reg. Route Between Boston and Buffalo, 121 M.C.C. 782 (1975). The Commission's only response to those cases is to label them as "aberrations." Far from being aberrational, however, we find Bonanza And Schuster consistent with prior I.C.C. cases concerning notice and, more importantly, consistent with the mandates of due process and the policies behind the Interstate Commerce Act and the Administrative Procedure Act.
 
 
 15
 In Bonanza, the Commission initially denied Bonanza's application because of its failure to make its intent to tack explicit. 92 M.C.C. 220 (1963). The Commission described Bonanza as "an irregular route carrier seeking regular route authority," Id. at 222. The Commission found that the application:
 
 
 16
 was not informative as to the true nature of the destination involved or the service performed . . . . A simple note, to the effect that service . . . is for the purpose of interchange . . . would be more in keeping with Canon 29 of our Code of Ethics which requires candor and fairness in the presentation of cases before the commission.
 
 
 17
 92 M.C.C. at 222. Commissioner Tierney dissented in part from the decision, stating:
 
 
 18
 I believe republication in the Federal Register would allow any person who did not appear at the hearing, but was prejudiced by the lack of notice of the service actually proposed, an opportunity to participate and protect its interests.
 
 
 19
 Id. at 223. When Bonanza came before the Commission a second time, Commissioner Tierney's position held sway. Writing the decision, Commissioner Tierney stated:
 
 
 20
 The application as filed sought regular-route authority to transport Gilsonite from Bonanza to Creston, serving Craig as an intermediate point. Applicant's purposes in seeking this authority were (1) to allow it to tack with its existing authority at Craig in order to provide direct service from Bonanza to points in its authorized Wyoming territory and (2) to allow it to interline shipments destined to Eastern points with other motor carriers at Creston.
 
 
 21
 It was found in the prior report that the applications as filed and published in the Federal Register failed to give adequate notice to possibly interested persons of the true nature of the service proposed, and that this factor required that the application be denied. We remain convinced that the description of the proposed service was, territorily, less complete than it should have been. Upon reconsideration of the facts of this case, however, we now believe that outright denial of the application is not warranted on this basis. A number of motor and rail carriers operating in the considered territory have actively opposed the application, and it appears unlikely that there are many, if any other, carriers whose interests are directly involved. Accordingly, we conclude that a grant of authority may properly be made here, subject to republication in the FEDERAL REGISTER so that any interested person not heretofore apprised of the nature of the proposed service will have an opportunity to be heard.
 
 
 22
 94 M.C.C. at 622-23. Contrary to the Commission's argument here, the sound result reached in Bonanza is consonant with Commission policy dating back many years. In Nelson Transport, Inc., Extension La Plata, Mo., 79 M.C.C. 743, 747 (1959), the Commission stated:
 
 
 23
 . . . it is clear on this record that the application as originally filed failed to disclose the true purpose of the proceeding. Purposeful or not, by the means of filing an application purportedly seeking limited territorial authority, interested parties, such as Ace, were given inadequate notice. Needless to say we do not condone application filings that do not disclose the true nature of the proposed application.
 
 
 24
 In Blue Ridge Transfer Co., Inc., Extension Sumter, S.C., 84 M.C.C. 239 (1960), the Commission found that no intent to tack was automatically presumed when the Existing service of the applicant involved irregular route authority. Conversely, in Denver-Albuquerque Motor Transport, Inc., Extension Arizona, 91 M.C.C. 582, 584 (1962), the Commission found that published notice was inadequate when it failed to state that irregular route authority sought would be joined with existing regular routes. The Denver and Blue Ridge decisions were relied on in Bonanza ; they form a solid basis for the conclusion in Bonanza that when irregular route authority is part of the tacking equation, explicit notice of an intent to tack must be included in the Federal Register. See also Floyd & Beasley Transfer Co., Inc., Ext. Childersburg, 98 M.C.C. 304 (1965); Kreider Truck Service, Inc., Extension Feed Ingredients, 92 M.C.C. 622, 663 (1963).
 
 
 25
 The most fundamental objection to the Commission's reliance on the regular route-irregular route distinction is that it totally misses the simple and uncomplicated purpose of Federal Register notice to inform. That purpose is not fulfilled when ambiguous notice can be justified only by reference to equally ambiguous precedent. Notice is required by the due process clause, the Interstate Commerce Act, and the Administrative Procedure Act because it is fundamentally unfair for application proceedings to commence without giving opposing carriers or members of the public who may be adversely affected by the application a chance to be heard. Federal Register publication is not an empty or formal gesture. It is an indispensible jurisdictional requirement that must be satisfied with regard to practical substance, not mechanical form. Mullane v. Central Hanover Bank, supra, 339 U.S. at 314, 70 S.Ct. at 657. Put simply, an interested member of the public should be able to read the published notice of a motor carrier's application and understand the essential attributes of that application. Others who see the notice should not have to guess the applicant's true intent. Notice should not depend on inferences to be gathered from the deciphering of restrictions, or from a particular carrier's past associations with the applicant. The Commission's arguments divert attention from the important point that adequate notice must be provided to Any interested person. 49 U.S.C.A. §§ 305(e), 306(b); 5 U.S.C.A. § 554(b); Buckner Trucking, supra, 354 F.Supp. at 1219. In Kreider Truck Service, supra, the Commission itself stated:
 
 
 26
 it is now clear that carriers who would perform an irregular-route service which would involve tacking or interchange must, in filing an application, inform The public as to the true nature of the proposed service.
 
 
 27
 92 M.C.C. 622, 663 (emphasis added). Certainly the highly regulated nature of the trucking industry necessitates the use of shorthand idioms peculiar to the industry when notice of a motor carrier application is published. We do not suggest that a motor carrier's application be completely intelligible to an uninitiated layman.[4] It is necessary, however, that the true nature of the authority sought be completely described, even if in technical jargon. The notice published in this case does not meet that standard.
 
 
 28
 In requiring republication of notice with an explicit statement of an intention to tack, our primary concern is not the specific plight of NAE but the duty owed by the Commission to other potentially interested members of the public. Because adequate notice to all interested persons goes to the very jurisdictional validity of agency action, the Commission's order cannot be rescued by arguments aimed solely at what NAE could or actually did infer. Even if NAE was less than diligent in determining the scope of Floyd's application and in presenting the notice argument to the Commission,[5] insufficient published notice renders the order jurisdictionally invalid. The Joint Board knew that the failure to include notice of tacking was an issue in the case and it erroneously held that the lack of notice was cured by the regular route-irregular route distinction. Since adequate notice is for the benefit of all interested members of the public, no Commission order can be approved until adequate notice is published. There is both Commission and judicial precedent for the appropriate remedy when published notice of a motor carrier application is found defective. The grant of authority must be stayed pending republication in the Federal Register and an opportunity for interested persons to be heard. Bonanza Trucking, supra, 94 M.C.C. 620, 622; Georgia-Florida-Alabama Transportation Co., Inc. v. United States, 290 F.Supp. 764, 769 (M.D.Ala.1968) (three-judge court).
 
 III.
 
 29
 The Commission's order allows Floyd to tack at the privately owned plantsites of Ebsco Industries near Vincent, Alabama, and Avondale Mills near Rockford, Alabama. Floyd's trucks must physically move through the plantsites for this tacking to occur. See, e. g., M. I. O'Boyle & Son, Inc., Interp. of Certif., 52 M.C.C. 248, 251 (1950), Aff'd 92 U.S.App.D.C. 383, 206 F.2d 473 (1953). The appellants argue that plantsite tacking should be illegal because it places continuance of through service by the carrier under the control of the plantsite owner. This control by the plantsite owners allegedly violates the Interstate Commerce Act's mandate that the Commission regulate carriers so as to provide "continuous and adequate service." 49 U.S.C. § 304. The appellants raise the spectre of such near-extortionate behavior by plantsite owners as conditioning through operations on so-called "toll bridge" payments that amount to illegal rebates and price discrimination. The Commission, it is said, will be powerless to combat these whimsical and capricious interruptions of service because it has no jurisdictional authority over the private plantsite owners. We find the appellant's arguments unpersuasive.
 
 
 30
 A long line of Commission cases authorizes private plantsite tacking. See, e. g., Johnston's Fuel Liners, Inc., Ext. Coal Tar Products, 121 M.C.C. 621, 623 (1975); Greyhound Lines, Inc. v. Grey Line Scenic Tours, 121 M.C.C. 242, 255 (1975); Holt Motor Express, Inc., Modif. of Certif., 120 M.C.C. 282, 288 (1974); Wheeling Pipe Line, Inc., Ext. Ethylene Pibromide,82 M.C.C. 229, 234 (1960); Cf. M. I. O'Boyle & Son, Inc., Interp. of Certif., 52 M.C.C. 248, 251 (1950), Aff'd 92 U.S.App.D.C. 383, 206 F.2d 473 (1953) (tacking through a military base). It is difficult to imagine any trucking operation that does not routinely require the cooperation of numerous other businesses outside the jurisdiction of the I.C.C. Tacking at privately owned plantsites is indistinguishable from the many operations involving privately owned terminals or loading facilities that motor carriers utilize daily. If abuses arise from the use of private plantsites for tacking, the appellants, or any other aggrieved party, may file a complaint with the Commission. 49 C.F.R. 1100.24 Et seq. If Floyd is at fault, the Commission may revoke or alter its operating authority. If the plantsite operator should revoke permission to tack at the site or impose intolerable conditions, the Commission may relocate its joinder point. See Bell Extension Longview, Tex., Gateway, 105 M.C.C. 768 (1967), Aff'd sub nom. Hearin-Miller Transporters v. United States, 301 F.Supp. 258 (S.D.Miss.1969), Aff'd 397 U.S. 41, 90 S.Ct. 814, 25 L.Ed.2d 39 (1970). Speculative objections to the wisdom of private plantsite tacking was not enough to overturn a practice that has enjoyed longstanding Commission approval. It is well within the Commission's authority to permit such tacking and to police abuses should they occur.
 
 IV.
 
 31
 The Commission's order is stayed pending corrected republication of notice in the Federal Register. Any interested member of the public, including NAE, shall have the right to file protests and seek participation in the remanded proceedings pursuant to the Commission's normal rules of practice. As we note in part II, this procedure is mandated by the jurisdictional defect that was created by improper public notice. We have ruled unfavorably on the appellant's private plantsite argument at this juncture because it presents a purely legal and policy issue that is sure to resurface on remand. Because the Commission may reevaluate its substantive conclusions in light of whatever new evidence may come forward as a result of this order, we do not at this point rule on the sufficiency of the evidence supporting the partial grant of Floyd's application.
 
 
 32
 REMANDED WITH DIRECTIONS.
 
 
 
 [1]
 "Tacking" is defined as the right to join two or more authorized routes of one common carrier at a point common to those routes. Tacking between two regular route authorities would usually occur at the intersection point of those routes; tacking of regular to irregular authorities or between two irregular authorities might occur at any point in which the specified regular route transverses the irregular route area or at any point at which two irregular route service areas coalesce. See generally Ephraim, "Routes and Territories Regular Routes, Irregular Routes," 1 Transportation Law Institute, Operating Rights Applications (1968). See also, Refrigerated Transport Co., Inc. v. I. C. C., 552 F.2d 1162, 1166-69 (5th Cir. 1977)
 
 
 [2]
 This regulation has been modified so that the caption summary of the authority sought that is to be printed in the Federal Register is prepared by the applicant itself and submitted as part of the application. 49 C.F.R. § 1100.247(c). The regulation further provides that "incomplete or incorrect captions may result in rejection of the application." Under both the old and new regulations, it is the applicant who holds primary responsibility for assuring the accuracy of the notice. Assuming that the contents of the published notice are otherwise complete, it is well settled that publications in the Federal Register are deemed legally sufficient notice to all interested persons. See 44 U.S.C. § 1507; Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)
 
 
 [3]
 "Interlining" is the physical transfer of shipments from one carrier to another at common service points. A related practice is "interchanging," the transfer of vehicular equipment, usually tractors, from one carrier to another at common service points. NAE had participated as an interlining carrier with Floyd at their common service points at Vincent and Sylacauga, Alabama. Floyd, under one of its irregular route authorities, would transport goods to Sylacauga. At Sylacauga, the shipment would be transferred to NAE's equipment and taken to Vincent. At Vincent, the shipment would be reloaded on Floyd equipment for further transport
 
 
 [4]
 Cf. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 387, 68 S.Ct. 1, 5, 92 L.Ed. 10 (1947) (Jackson, J., dissenting):
 To my mind, it is an absurdity to hold that every farmer who insures his crops knows what the Federal Register contains or even knows that there is such a publication. If he were to peruse this voluminous and dull publication as it is issued from time to time in order to make sure whether anything has been promulgated that affects his rights, he would never need crop insurance, for he would never get time to plant any crops. Nor am I convinced that a reading of technically-worded regulations would enlighten him much in any event.
 
 
 [5]
 Although the Joint Board specifically addressed the notice of tacking issue in its opinion, NAE itself was far from diligent in pressing the point. NAE's first petition for intervention cited "the length and complexity of the grants of authority sought" but did not explicitly mention the tacking issue. The petition stated that NAE had mistakenly assumed that its interests in the application would be removed by amendments. Although NAE apparently did make the tacking argument orally before the Joint Board, NAE's counsel did not greatly elaborate on the point. Because the notice defect was jurisdictional, NAE, along with all other interested parties, will receive a new chance to present arguments and evidence to the Commission. As we note in the text, this result is compelled by the Commission's duty to the public to provide proper notice rather than any improper treatment with regard to NAE