SEA–LAND SERVICE, INC., Petitioner,

v.

**FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,**

Seatrain International S. A., Hapag-Lloyd A. G., et al., Intervenors.

No. 79–2493.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 18, 1980.

Decided April 14, 1981.

Paul J. McElligott, Washington, D. C., with whom Neal M. Mayer, Peter J. King and Paul D. Coleman, Washington, D. C., were on the brief, for petitioner and Intervenor, Seatrain International S. A.

Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., with whom John C. Cunningham, Atty., Federal Maritime Commission, Washington, D. C., was on the brief for respondents. Sanford M. Litvack, John J. Powers, III, Robert J. Wiggers and Robert B. Nicholson, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent, United States of America.

Edward Schmeltzer, Washington, D. C., with whom George J. Weiner, Annandale, Va., was on the brief, for Intervenor, Hapag-Lloyd A. G., et al.

Before McGOWAN, Chief Judge, and EDWARDS and GINSBURG, Circuit Judges.

Opinion for the court filed by Chief Judge McGOWAN.

McGOWAN, Chief Judge:

Sea-Land Service, Inc. ("Sea-Land") petitions for review of a Federal Maritime Commission order modifying the Initial Decision of an Administrative Law Judge which had approved two agreements allowing for joint commercial activity among common carriers. These agreements were the product of negotiation and compromise between the parties to the agreements, on the one hand, and various independent carriers such as Sea-Land, who were likely to be significantly affected by the agreements, on the other. Upon reviewing the Initial Decision, the Commission modified the negotiated agreements in several respects. Because we find that the Commission effected major modifications in the agreements without giving prior notice and an opportunity for comment, we remand the Commission's order for further proceedings consistent herewith.

I

Section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 (Supp. III 1979), requires that "[e]very common carrier by water . . . shall file immediately with the [Federal Maritime] Commission . . . every agreement with another such carrier, . . . or modification or cancellation thereof, . . . providing for an exclusive, preferential, or cooperative working arrangement." *Id.* at ¶ 1. The Federal Maritime Commission, in turn, may "disapprove, cancel, or modify the agreement," *id.* at ¶ 2, but any such modification or disapproval may be made only after "notice and hearing." [1]

---

1. *Id.* Section 15 is cited in full and discussed at text preceding note 14 *infra*.

In 1971, the Commission approved a joint service agreement (Agreement No. 9929), between two shipping lines, Hapag-Lloyd Aktiengesellshaft ("Hapag-Lloyd") and Holland-America Line, a predecessor in interest to Intercontinental Transport B. V. ("ICT"). This joint service, known as Combi-Line, operated LASH[2] vessels between United States ports on the Gulf of Mexico or eastern seaboard, and ports in Europe excluding those in the Mediterranean.[3] Hapag-Lloyd and Holland-America shared one vote in any conference or rate agreement to which the joint service became a party. (II J.A. 312, 351).

In 1976, Hapag-Lloyd, ICT, and Compagnie General Transatlantique ("CGT")[4] filed an amendment to No. 9929, designated Agreement No. 9929–2, which differed from the original in four respects. First, it added CGT as a party to the agreement. It also terminated a portion of the Combi-Line joint service—the containerized cargo carriage service—and created in its place a new coordinated container service, whereby the parties to the joint service might cross-charter container space on each other's vessels but otherwise would market and solicit their own cargo spaces. Third, the amendment continued the joint LASH and conventional vessel service between Hapag-Lloyd and ICT. In addition, CGT joined the service for the purpose of contributing capital equipment and, at some later date, operating a LASH feeder operation.[5] Finally, Agreement No. 9929–2 authorized separate votes for Hapag-Lloyd, ICT, CGT, and the joint LASH service as a whole in any conferences or rate agreements in which they participated.[6]

At the same time, ICT and CGT filed a separate Agreement, designated No. 10266. This was termed a "Joint Marketing Agreement," and provided that the parties would (1) market all available cargo space jointly, (2) designate joint agents, (3) issue a joint bill of lading, (4) share revenues and expenses, and (5) function as separate parties, with separate votes, in any conferences or rate agreements (II J.A. 338–41).

The Federal Register Notice of the filing of the new and amended agreements elicited protests and requests for hearing from Sea-Land, as well as from numerous other independent carriers.[7] Accordingly, the Commission issued an Order of Investigation and Hearing to determine whether Agreements No. 9929–2 and 10266 should be approved, disapproved, or modified pursuant to Section 15 of the Shipping Act.

In its order, the Commission observed that joint service agreements are presumptive violations of section 1 of the Sherman Antitrust Act, (I J.A. 7), and that the proponent of any such agreement must meet the heavy burden of showing that, on balance, the agreement is in the public interest. Among the issues the Commission then set for hearing were (1) "whether approval of the Agreements will enable the parties [to the agreements] to offer a valid container service without overtonnaging the trade, as the proponents claim, or whether the trade is already overtonnaged and will be made more so by approval of the Agreements, as the protestants claim," and (2) "whether the separate voting provisions contained in Agreements No. 9929–2 and

---

2. "LASH" is an acronym for "lighter aboard ship," as opposed to container, breakbulk, or combination breakbulk/containership vessels.

3. Agreement No. 9929 was subsequently amended to extend to conventional vessels as well (II J.A. 315).

4. CGT was later succeeded in interest by Compagnie Generale Maritime ("CGM"). CGM is party to the agreements at issue and, for the sake of simplicity, we will refer to the third party to these agreements as "CGM" in our discussion of the proper disposition of this case at III, IV & V *infra*.

5. Agreement No. 9929–2 also gave the joint service the authority to charter supplemental space on conventional vessels as needed. The ALJ, however, deleted this authority in his Initial Decision (II J.A. 240–41), and proponents have chosen not to challenge this decision.

6. II. J.A. 317–37.

7. These included United States Lines, Inc. ("USL") and Seatrain International, S. A. ("Seatrain").

10266 may result in unjust or unfair advantages to the parties in conference affairs." (I J.A. 5–6).

The parties to the upcoming hearing, proponents and opponents alike, then began marshalling their evidence. Proponents assertedly failed to comply with certain of Sea-Land's discovery requests. Proceedings to compel answers to interrogatories and depositions ensued, and eventually proponents withdrew Proposed Agreements Nos. 9929–2 and 10266 and submitted modified proposals in their place.

These modified proposals, designated Agreements Nos. 9929–5 and 10266–2 respectively, differed markedly from the earlier agreements. First, they dispensed with the controversial multiple voting provisions, providing instead that, as parties to a conference, proponents could "not exercise in a total a greater number of votes than that which may be accorded to a single member of such conference." (II J.A. 361). Henceforth, whenever a party entered a conference as a member of a joint service, it would cast only one vote in concert with the other members of the joint service, and not retain a separate vote.[8] Second, proponents reduced the maximum amount of tonnage that could be transported on the joint service lines per week. After these amendments were concluded, testimony was heard on the amended agreements only, and all evidence as to the earlier agreements was stricken from the record. (I J.A. 114, 116; II J.A. 347–50).

Agreements Nos. 9299–5 and 10266–2 were subsequently approved in a lengthy Initial Decision by Administrative Law Judge Stanley M. Levy (II J.A. 177–232). The ALJ first observed that both Agreements were rate-fixing provisions presumptively violative of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (Supp. III 1979) (II J.A. 208). The Supreme Court has held that the party seeking approval of such an agreement must "bring forth such facts as would demonstrate that the . . . rule was required by a serious transportation need, necessary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act."[9]

The ALJ concluded, however, that the proponents had met this burden. (II J.A. 208–232). He reasoned that the agreements would not adversely affect competing carriers because proponents had added sufficient cargo capacity limitations to No. 9929–5 and had eliminated multiple voting from the Agreements. (II J.A. 224). No exceptions were filed to the Initial Decision, although the ALJ had placed several conditions on the operation of the agreements.[10]

Nonetheless, the Commission undertook to review the Initial Decision and, on June 5, 1979, issued an Order Partially Adopting Initial Decision. (II J.A. 234–51). The Commission modified the agreements in both technical and substantive respects. First, it divided No. 9929–5 into two sepa-

---

8. Conference voting provisions and their various competitive implications are discussed at notes 28–31 and accompanying text *infra*.

9. *FMC v. Aktiebolaget Svenska Amerika Linien (Swedish American Line)*, 390 U.S. 238, 250, 88 S.Ct. 1005, 1012, 19 L.Ed.2d 1071 (1968). In *United States Lines, Inc. v. FMC*, 584 F.2d 519 (D.C.Cir.1978), this court held that the Commission is required to examine closely not only those agreements which constitute *per se* violations of the Sherman Act, but also those which merely have "antitrust implications." As the court explained,

the fact that a given practice is considered under a rule of reason, rather than as a *per se* violation, does not mean that the dangers to competition in any particular circumstance are necessarily lower; clearly, certain practices which are not *per se* violations may,

depending upon the facts of the particular case, restrict competition more severely than would *per se* restraints.

*Id.* at 529 n.31.

10. Agreement No. 9929–5 was approved on the condition that CGT (now CGM) not participate in the Combi-Line LASH vessel service and that Hapag-Lloyd and ICT not concertedly offer LASH service between Mexican and United States ports (for reasons having to do with the economic conditions in Mexican ports). Agreement No. 10266–2 was also approved on the condition that the parties not offer joint container/breakbulk service between Mexican and United States ports. Reporting requirements were added to No. 9929–5. *See* Initial Decision, II J.A. 232; Order Partially Modifying Initial Decision, II J.A. 234.

rate agreements: No. 9929–6, the Hapag-Lloyd/ICT joint service; and a new Agreement, designated No. 10374, which authorized the cross-charter container arrangement involving Hapag-Lloyd, ICT and CGT. The Commission also deleted the authority of the parties jointly to charter supplemental space on other carriers' vessels. (II J.A. 240–41).

With respect to Agreement No. 10266–2, the Commission found that the Agreement actually created a joint service, not merely a joint marketing arrangement, because the Agreement provided for revenue sharing, as well as several other characteristics of a joint service.[11] Although the Commission believed it unlikely that the ICT/CGT joint service would ever operate outside the framework of Agreements Nos. 9929–6 and 10374, the Commission believed that, in the event Agreement No. 10374 were ever terminated, ICT and CGT might begin transporting unlimited amounts of cargo under Agreement No. 10266–2, creating serious overtonnage problems for competing lines. (II J.A. 242–43). Therefore, the Commission placed an 800 TEU per week (averaged quarterly) cargo limitation upon this service, similar to that placed upon the parties to Agreement No. 10374.[12]

Finally, the Commission modified two agreements with respect to voting. Originally, Agreement No. 9929–5, as approved by the ALJ, had provided that the members of the LASH service and the container agreement should have only a single vote per service in any conferences or rate agreements. The Commission modified this, applying the single vote rule to the joint LASH service (the new Agreement No. 9929–6), that is, forcing the parties to vote in concert, but allowing the parties to the cross-charter container service (No. 10374) to exercise one vote each in any

conferences. The Commission reasoned that No. 10374 had substantially altered the old Combi-Line container service by no longer providing for revenue sharing, and thus the parties to that agreement could now be considered competitors. Therefore, the Commission concluded, the parties no longer had the unity of interest which makes single voting a necessity: in fact, a single vote requirement would undercut the benefits achieved by the reorganization of the old Combi-Line container system. (II J.A. 241–42).

Sea-Land, United States Lines, and Seatrain objected vigorously to the Commission's modifications pertaining to voting and cargo limitations, and petitioned for clarification and reconsideration. The Commission's Bureau of Hearing Counsel supported the petition, arguing that, if the Final Order had granted more authority to the proponents than they requested in the previous ALJ hearing, section 15 required that interested parties be afforded another opportunity for comment. (II J.A. 275). The Commission denied reconsideration, and Sea-Land petitioned for review of the Commission's order. Seatrain, a common carrier similarly situated, intervened on behalf of Sea-Land. Hapag-Lloyd, ICT, and CGM [13] intervened to urge affirmance.

### III

Section 15 of the Shipping Act of 1916 generally requires that joint service agreements be filed with the Commission. It provided in relevant part:

> Sec. 15. Every common carrier by water, or other person subject to this Act, shall file immediately with the Commission a true copy ... of every agreement with another such carrier ... or modification or cancellation thereof, to which it

---

11. See notes 31–32 and accompanying text infra.

12. The Commission did not, however, adopt the additional limitations which No. 9929–5 placed upon the parties in special instances. These included limitations placed upon ships transporting cargo eastbound from U. S. South Atlantic ports of 100 TEU's weekly, and upon

ships transporting cargo westbound to U. S. South Atlantic ports of 225 TEU's weekly (both averaged monthly). Furthermore, Agreement No. 9929–5 placed a limit of 30 TEU's weekly eastbound and from 10 to 20 TEU's weekly westbound on reefer containers.

13. See note 4 supra.

may be a party or conform in whole or in part, fixing or regulating transportation rates or fares . . . controlling, regulating, preventing, or destroying competition . . . or in any manner providing for an exclusive, preferential, or cooperative working arrangement.

Section 15 also defines the duties of the Commission:

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, . . . or to be contrary to the public interest, . . . and shall approve all other agreements, modifications, or cancellations.[14]

■ In essence, section 15 requires that the Commission ultimately "disapprove, cancel, modify" or else affirmatively approve all agreements which may affect competition among competing carriers, and that all such final action must be preceded by "notice and hearing." *Id.* Furthermore, the Commission retains an affirmative duty to review an agreement in some detail even when proponents and opponents alike have settled their differences below, because mere acquiescence by private parties does not determine whether the agreement fosters competition in the shipping industry as a whole. *Agreement No. 9902–3 et al. (Modification of Euro-Pacific Joint Service),* —— F.M.C. ——, 19 S.R.R. 141, 143 (1979). Nor is the Commission bound by the ALJ's findings of fact or conclusions of law. Section 8 of the Administrative Procedure Act, 5 U.S.C. § 557(b) (Supp. III 1979), makes plain that "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision."[15] Beyond those powers granted under the Shipping Act and APA, the Commission also has the power residing in all federal agencies to alter an applicant's authority at the final decision stage of the proceeding "so long as normal due process considerations have been extended to the applicant's opponents."[16]

■ Petitioners do not challenge as a general principle the Commission's power to modify agreements initially approved by the ALJ. Rather, they argue that, under the facts of this particular case, the Commission's modifications were contrary to the evidence, as well as being so significant as to require additional notice and opportunity for comment under section 15. In such a situation, we are empowered to examine the Commission's decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (Supp. III 1979). In addition, however, before we consider the merits of the Commission's decision we are bound to examine the Commission's actions with an eye to whether the procedural aspects of section 15 were scrupulously observed by the Commission in arriving at its decision.[17] We find that they were not so observed.

The gravamen of Sea-Land's procedural complaint is that the Commission expanded the authority of the three parties to the agreement without giving interested parties a chance to comment on the modifications. The Federal Maritime Commission and intervenor Hapag-Lloyd argue in opposition that the Commission is authorized by section 15 to afford a meaningful review to

14. 46 U.S.C. § 814 (Supp. III 1979). *See United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 527 (D.C.Cir.1978).

15. *Accord, Alcoa S. S. Co. v. Federal Maritime Commission,* 321 F.2d 756, 758 n.5 (1963); *Union Mechling v. United States,* 390 F.Supp. 391, 397 (W.D.Pa.1974); *Braswell Motor Freight Lines, Inc. v. United States,* 275 F.Supp. 98, 103 (W.D.Tex.1967), *aff'd,* 389 U.S. 569, 88 S.Ct. 692, 19 L.Ed.2d 779 (1968).

16. Brief for Federal Maritime Commission at 7, citing *CAB v. State Airlines, Inc.,* 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353 (1950); *Florida Economic Advisory Council v. FPC,* 251 F.2d 643 (D.C.Cir.1957), *cert. denied,* 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066 (1958).

17. *Marine Space Enclosures, Inc. v. FMC,* 420 F.2d 577, 584 (D.C.Cir.1969); *Sea-Land Service, Inc. v. Connor,* 418 F.2d 1142, 1146 (D.C. Cir.1969).

all Initial Decisions, not merely to approve them *pro forma.* They assert that by requiring some changes as conditions of final approval the Commission "does not thereby create a new agreement and trigger the usual requirements of publication in the *Federal Register,* opportunity for comment and request for hearing." Rather, the Commission would distinguish between modifications formulated by private, self-interested parties, which require notice and hearing to non-parties, and the Commission's final changes, which are presumably infused with a full understanding of the agreement's implications to proponents and opponents alike. For this court to require that the full Commission conduct a hearing every time it modifies an agreement would, we are told, allow complaining parties to stall the implementation of such agreements indefinitely. The effect of conditional approval, the Commission concludes, is that the proponents of an agreement have the choice of either complying with the Commission's conditions or else withdrawing the agreement entirely.

■ As between the two positions, we think petitioner has the better argument on the facts of this case. To ignore the interests of aggrieved parties in the name of administrative economy flatly contradicts section 15, which requires "notice and hearing" before modification without regard to whether a private party or the Commission has formulated the modification. Although

we understand the Commission's concern about the possibility of endless administrative proceedings, we think a limiting principle exists which allows the Commission both to vindicate society's interests in efficient administrative proceedings and at the same time to protect the interests of all parties who stand to be affected by section 15 agreements. We conclude that in some circumstances, discussed below, the Commission should remand its modifications of an agreement for further comment by persons not party to the agreement.

IV

■ Section 15 requires that any Commission order "to disapprove, cancel, or modify any agreement, or any modification or cancellation" must be preceded by "notice and hearing." 46 U.S.C. § 814 (Supp. III 1979). The hearing contemplated by this section is not the full administrative hearing on the record that is required by the Administrative Procedure Act,[18] although a similar procedure was followed by the ALJ in this case. Rather, the "notice and hearing" requirement in section 15 contemplates "meaningful public participation"[19]; at the very least, this amounts to the Commission's affording any party who stands to be injured by a proposed private agreement the chance to submit statements and data explaining why he believes the newly created agreement should not be approved.[20]

18. Sections 556 and 557 of the APA, 5 U.S.C. §§ 554(c) (Supp. III 1979), apply only when the statute mandating a hearing requires that the hearing be "on the record." The Shipping Act does not so provide, as this court concluded in *United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 536–37 (D.C.Cir. 1978).

19. *United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d at 540.

20. In *Marine Space Enclosures, Inc. v. FMC,* 420 F.2d at 589 & n.36, Judge Leventhal observed that the hearing requirement "may be satisfied by something less time-consuming than courtroom drama." Elsewhere, however, he noted that "[p]rocedural requirements depend in part on the importance of the issues before the agency," *id.* at 585–86 n.22, and that

antitrust issues are of the utmost importance in most FMC determinations. *Id.* at 589.

Thus, a hearing on a section 15 agreement would most often take the form adopted by the ALJ in the present case, although the Commission has the power to "determine, after appropriate administrative proceedings, that some types or classes of agreements . . . are of such a *de minimis* or routine character as not to require formal filing," and thus not to require hearing. *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 276, 88 S.Ct. 929, 938, 19 L.Ed.2d 1090 (1968); *Seatrain International, S. A. v. FMC, quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) [FMC need only conduct "whatever proceedings are necessary to secure sufficient information so that its final decision will reflect 'a consideration of the relevant factors.' "].

The informal nature of the hearing provision does not, however, detract from its importance as a procedural safeguard. It is the only means by which carriers who are not parties to proposed agreements can exert some influence upon the administrative process. Parties to an agreement always have the option of withdrawing the agreement if they do not like the Commission's modifications, but outside parties have no power to influence agreements other than through contributions to the hearing process. We think that the purpose of this safeguard may be subverted when the Commission makes substantive changes at the final decision stage which were not discussed at the hearing, that is to say, when the Commission in effect creates new agreements in its final order.

Nevertheless, it is incorrect to conclude that the Commission may never modify the Initial Decision unless the substance of the modification has first been thoroughly discussed at a prior hearing, for this would put the Commission in an untenable position. If it subjected Initial Decisions to significant scrutiny and recognized the need for modifications, it could throw almost every agreement into an endless cycle of amendment, hearing, review and modification. On the other hand, if the Commission merely approved every Initial Decision *pro forma*, with no modifications at all, its role as the ultimate interpreter of section 15 policies would quickly atrophy. The "notice and hearing" requirement must engage at some point between these two extremes.

■ The generally accepted distinguishing factor, and one we consider applicable to this case, is whether the final agency action expands the authority proposed by the parties to the agreement. This limitation is sound from the standpoints of legal precedent and policy. Where the modification does not alter the substance of the agreement in any respect, the Commission should have every right to edit the agreement to conform with Commission practices or simple principles of organization. Similarly, any modification which serves only to restrict, not to expand, the authority of the parties to the agreement should not require notice and hearing. In that event, only the proponents will be aggrieved, and they are always free to abandon the modified agreement and to submit an amended agreement for new consideration. The Commission made both types of modification in this case. For instance, it divided two agreements into three, a change which even Sea-Land recognizes is purely a matter of form.[21] The Commission also restricted the authority of the proponents by deleting the container service's authority to charter supplemental space on other vessels.[22]

If such modifications required new notice and hearing, the Commission's worst fears would be realized, for then ostensibly aggrieved parties would have the power to stall the adoption of an order indefinitely. Nor would the purpose of the hearing requirement be well-served by such an innovation. In the context of section 15, a provision focusing primarily on the competitive implications of common carrier agreements, the notice and hearing requirement seems intended to create a mechanism through which interested parties can air their views as to the competitive implications of an agreement and the Commission can gain sufficient information to make a reasoned decision as to the competitive impact of that agreement. We know of no reason why the hearing requirement need ever be applied when it will operate only as a mechanism by which private parties can endlessly stall the adoption of reasonable orders or contest general Commission policies, on grounds unrelated to the competitive implications of the agreement under consideration.

We think, however, that "agency action *expanding proposed authority* is improper without proper findings based on substantial evidence, adequate notice, and consider-

**21.** *See* Brief for Sea-Land at 26–29.

**22.** *See* note 5 *supra*.

ation of objections."[23]  As one court recently noted,

> The requisites for a lawful grant of authority greater than that proposed in the application are (1) a finding supported by substantial evidence of a public need therefor; (2) *republication of the enlarged grant so as to afford interested parties adequate notice thereof; and (3) consideration of objections thereto following republication.*[24]

The court explained that "[t]he absence of the establishment of each of the requisites results in depriving a person or corporation of due process."[25]

In another recent case concerning the Interstate Commerce Commission, the Fifth Circuit held that a new notice and hearing proceeding is required when the original Federal Register Notice has failed to describe the true nature of the issues involved in the order under consideration. *North Alabama Express, Inc. v. United States*, 585 F.2d 783 (5th Cir. 1978). Since "adequate notice is for the benefit of all interested members of the public," the *North Alabama* court reasoned, "no Commission order can be approved until adequate notice is published." *Id.* at 790. Adequate notice in that case amounted to alerting the public as to the practical implications of a rather technically worded order. Only then would those parties who would be affected by the Commission's order have the opportunity to focus on the real issue at the subsequent public hearing. The court's remedy for the defective procedures adopted in that case was that "[t]he grant of authority must be stayed pending republication in the Federal Register and an opportunity for interested persons to be heard." *Id.*

Although *North Alabama* dealt expressly with the inadequacy of the initial Federal Register publication of notice, it was grounded in a more general view of the purpose of an administrative hearing, a view which supports our decision in the present case. In *North Alabama* the court was primarily concerned that the notice be such that interested parties be able to make meaningful use of the administrative hearing provided for their benefit, and that the Commission gain useful insights into the implications of the order under consideration.

■ In the present case, too, Sea-Land alleges that it was deprived of its right to notice and hearing because the agreements, as finally framed by the Commission, differed substantially from the agreements that were the subject of the original notice and administrative hearing. It is certainly true that the original notice bore little relation to the hearing actually held on the modified proposed amendments, and that the Final Decision differed substantially even from the modifying amendments discussed at the hearing. The potential for the same unfairness as occurred in *North Alabama* may have been present here, especially since the opponents and proponents settled most of their differences before the hearing, at which time the record was cleansed of any reference to the thorny issues which were resurrected by the Commission in its final order. Thus, the administrative hearing concentrated on many issues irrelevant to the order as finally framed.

We think that *Arkansas-Best* and *North Alabama* support our view that the Commission's expansion of the authority granted in an Initial Decision creates what is in essence a new agreement, requiring new notice and opportunity for comment. It is significant that the Commission's Hearing Counsel agrees with us. In the Reply of Hearing Counsel to Sea-Land's Petition for Clarification and Reconsideration in the present case, counsel recognized that "if . . . the Commission's Order did grant more

---

**23.** Brief for Sea-Land at 27 (emphasis added). See also II J.A. 241–42.

**24.** *Arkansas-Best Freight System v. United States*, 399 F.Supp. 157, 165 (W.D.Ark.1975) (emphasis added).

**25.** *Id.*

authority than Proponents requested, ... the administrative process requires that Protestants be given an opportunity to be heard on these issues." (II J.A. 275).

Even apart from considerations of due process and fair administrative procedure, there are practical reasons why there should be limits upon the power of the Commission to modify an Initial Decision. An aggrieved party determining to challenge a proposed section 15 agreement relies upon the substance of the proposed agreement in framing his attack because it is the substance of the agreement that will determine the issues to be explored at the subsequent hearing before the ALJ. If the Commission had the power to effect wholesale modifications in the substance of an agreement well after the aggrieved party had had his final say, any party seeking to challenge the proposed agreement would have to conduct discovery, brief, and present oral arguments as to every possible issue that might be addressed at some later stage of the proceedings.

Clearly this would result in unwieldy discovery, briefing, and hearings but, more important, it would make it impossible for an aggrieved party to anticipate every possible modification of substance that the Commission might later choose to adopt. It would make "administrative process a charade and make[ ] impossible the task of protestants, ... [who would] have to attempt to meet every possible change or modification, including new powers and rights, that may appear as a new agreement rewritten by the Commission." [26] We are convinced that the notice and hearing requirement of section 15 does not contemplate that such a burden shall be shouldered by the very parties it was intended to help.[27] We conclude that any modification in the Initial Decision which expands the powers of the parties to the agreement requires new notice, an opportunity for comment, and consideration of objections before the newly modified agreement may finally be adopted by the Commission.

## V.

Sea-Land contests certain of the Commission's modifications on the grounds discussed above, i. e., that the Commission failed to afford aggrieved parties a chance for comment before expanding the authority of the proponents to these agreements. Two separate modifications are at issue here: (1) the provisions for multiple voting added to the containerized cargo agreement, No. 10374, and (2) the cargo limitation added to the ICT/CGM "Joint Marketing Agreement," No. 10266–3.

The practical implications of these agreements are not readily apparent to the untrained eye, and the Commission must be credited with some expertise in understanding the pro- and anti-competitive aspects of private carrier agreements. Nevertheless, we think that both modifications appear to have expanded the proponents' authority and, as such, should have been the subject of prior notice and opportunity for comment. Any confusion as to the reach and impact of these modifications stems precisely from the fact that they were never addressed by the ALJ in the context of an adversary inquiry eliciting relevant facts and contentions.

Sea-Land first challenges the Commission's decision to allow all parties to the container service (No. 10374) one vote each, rather than one single vote per service, in any conference or rate agreement. The agreement originally proposed as No. 9929–2, to which Sea-Land took vehement exception,[28] contained a multiple vote provision identical to the one finally adopted. In fact, the Commission specifically designated that original multiple voting provision as

---

**26.** Petition for Clarification and Reconsideration of Order Partially Adopting Initial Decision, No. 77–7, filed by Sea-Land, June 20, 1979 (II J.A. 263).

**27.** We observe that the Commission commonly designates amended agreements with new numbers and, in fact, designated the final agreements in this case with three new numbers.

**28.** *See* note 7 and accompanying text *supra.*

one of the issues of importance to be explored at the hearing.[29] After proponents removed this provision from the subsequent amended proposal (No. 9929–5), the issue of voting rights was deleted from the hearing agenda entirely. At the hearing, the only mention of voting provisions was the ALJ's comment that multiple voting was no longer an issue. (I J.A. 114, 116; II J.A. 347–50). As a result, Sea-Land and other aggrieved parties never presented evidence or aired their views as to the anticompetitive aspects of multiple voting with respect to these particular proponents and agreements.

Predictably, the Commission has defended its actions on the grounds that the voting modification is a mere restriction on the authority which, as we held above, does not require a new hearing. The Commission argues that Agreement No. 10374, authorizing the new coordinated container service, assures that the new container service will be significantly more competitive than the old. In fact, the change is described as being so profound that a new system of voting—the multiple voting provision—is now not only desirable but absolutely necessary. Retention of the single voting provision would, we are told, force carriers that are now competitors to act in concert and would undercut the positive effect of the change.

Unfortunately, this argument is grounded on an unproven assumption, namely, that No. 10374 has actually changed the container service so much that a new system of voting is now appropriate. Since the ALJ never took testimony on the issue of confer-

ence voting, there is no evidence on the record supporting this conclusion. The "expansiveness" or "restrictiveness" of the voting provision thus turns on a determination unsupported by any facts.

■ Whenever the Commission attempts to sidestep the hearing requirement by labeling a modification a "mere restriction," it bears the burden of explaining clearly and concisely exactly why the modification is obviously a "restriction" which is of interest only to the proponents. We anticipate that in the case of a voting provision modification an attempt at explanation would reveal the risks of proceeding to final decision without affording an opportunity for comment and consideration of objections. Conference voting has long been an item of contention between various competing shipping lines, and a significant number of maritime disputes have centered on the competitive effects of a particular voting provision in a particular case.[30] The anti- or pro-competitive impact of a multiple voting provision will always turn on the facts of the individual case, such as the particular parties involved, their relative strength or weakness within the industry, and, most important, whether the carriers involved in the agreement are so closely allied in interest as to make bloc voting likely. In such a situation, it is particularly inappropriate for the Commission to dispense with any notice and opportunity for comment by interested parties on the grounds that the Commission already understands the facts of the case.

■ The Commission itself has repeatedly recognized the complexity of the voting provision issue.[31] When considering

---

**29.** *Id. See* I J.A. 5–6.

**30.** For instance, the Commission was recently faced with a proposed agreement between the same three proponents as in the present case. *Agreement Nos. 9902–3 (Modification of Euro-Pacific Joint Service)*, 19 Pike & Fischer Shipping Regulation Reports 141 (Dkt. No. 77–4, March 29, 1979). In that case the agreement initially provided for multiple votes, but the proponents withdrew that provision and substituted a provision authorizing one single vote for the entire service. After a hearinp, the ALJ and Commission approved the agreement without multiple votes. It is noteworthy that, in a

fact situation involving the same parties and essentially the same competitive concerns, the Commission recognized that the voting provisions raised serious antitrust issues requiring a hearing.

**31.** *Id. See also Farrell Lines, Inc. v. FMC*, 475 F.2d 1332 (D.C.Cir.1973) (*per curiam*), in which this court affirmed an FMC order approving a conference voting provision, but retained jurisdiction over the matter so that it might reopen consideration of the provision in the event any unfairness resulted from the provision's

the propriety of multiple versus single voting with respect to another agreement, the Commission recently conducted a hearing complete with discovery, affidavits and memoranda. *Agreement No. 9973–3— Johnson ScanStar Service Voting Provision,* 18 Pike & Fischer Shipping Regulation Reports 807 (Dkt. No. 77–5, Aug. 15, 1978). After much deliberation, the Commission concluded that multiple voting in that particular situation would violate section 15 by depriving competing carriers of membership in the conference upon equal terms and conditions. In light of the procedures adopted in *Johnson ScanStar,* and of the undeniable controversy that surrounds most voting provision modifications, we disagree that the voting modification in the present case was so clearly pro-competitive and "restrictive" as to obviate the need for new notice and comment.

Furthermore, even if there were some case in which a voting provision modification would clearly constitute only a restriction of proponents' authority, this is not such a case. Very little is clear from the papers, because the only "facts" we have on hand are the Commission's conclusory statements concerning the competitive implications of the respective voting provisions.

Last, we feel compelled to underscore the irony of this whole dispute, which is that the Commission itself has not acted consistently with its own argument throughout the proceedings in this case. In its Initial Order, at which time it set Agreements Nos. 9929–2 and 10266 for hearing, the Commission had already been confronted with the allegedly "pro-competitive" modification of the container carriage agreement. Yet, it still considered the multiple voting provision in No. 9929–2 significant

enough to require a hearing. (I J.A. 5–6). That hearing was never held, of course, since the subsequent amended proposals abandoned the multiple voting provision. But by reinstating the multiple voting provision in its final order, the Commission adopted without inquiry the same provision it had earlier characterized as sufficiently significant to *require* notice and comment.

In short, the Commission's protestations only underscore the procedural deficiencies of the voting modification, deficiencies which we believe require remand of No. 10374 for consideration of its voting provision.

The second modification at issue is the Commission's addition of a cargo size limitation to Agreement No. 10266–2. This agreement between ICT and CGM was originally styled a "Joint Marketing Agreement," and was treated as such by the parties and the ALJ. As a condition for approval of the Agreement, however, the Commission added a cargo capacity limitation of 800 TEU's per week, averaged quarterly, and changed the title to "Joint Service Agreement." (II J.A. 240–43; 250).

The parties' dispute as to this modification is significantly more complicated than that surrounding the multiple voting provision. Sea-Land asserts that the Commission transformed a "Joint Marketing Agreement," which did not provide for any cargo capacity, into a joint service agreement which threatens to create a serious overtonnage problem and otherwise endanger competition along certain shipping routes. Such an expansion of authority, Sea-Land argues, cannot be instituted without further notice and opportunity for comment.

adoption. The *Farrell* court quoted an FMC report in which the Commission discussed the complexity of voting provision considerations:

Conference voting mechanisms are at best delicate things, presumably arrived at after due deliberation of alternatives. By and large the various procedures, and they cover a wide range, work well when considered in light of the large number and variety of agreements existing in our foreign commerce. These considerations, when taken

with the continuing change in carrier relationships, trade conditions and economic and competitive circumstances, makes us on the one hand cautious in the interference with existing voting procedures absent a showing of need; and on the other, makes it extremely difficult to formulate hard and fast rules for governance of future voting procedures. *Farrell Lines, Inc. v. FMC,* 475 F.2d at 1333, *quoting* Federal Maritime Commission Report, Dkt. No. 71–80, at 6 (May 8, 1972).

The Commission and intervenors argue in opposition that the "Joint Marketing Agreement," regardless of its title, has always amounted in substance to a joint service agreement because it contains a provision for revenue sharing, as well as several other provisions characteristic of a joint service. (II J.A. 240–43). For this and other reasons, the Commission considered it prudent to apply the same limitation to the ICT/CGM joint service as was applicable to Nos. 9929–6 and 10374. Thus, the Commission once again views its modification as a restriction on an otherwise unlimited power to carry cargo and undercut competition.

We find this dispute difficult to fathom, primarily because the various parties have assumed rather odd argumentative postures. For example, ICT and CGM have argued in favor of a limitation on their own ability to carry cargo; this would tend to indicate that they were delivered a windfall benefit—the right to carry cargo at all—which they never expected to gain from No. 10266–2. Also supporting this interpretation is Sea-Land's failure to object to No. 10266–2 on this ground in the proceedings below.

Since the beginning of the proceedings, the complaints of Sea-Land and other independent carriers have centered on the potential for overtonnage inhering in the joint LASH and container carriage agreements. It seems highly unlikely that, had Sea-Land believed that No. 10266–2 had also conferred upon ICT and CGM any ability to carry cargo, Sea-Land would placidly have stood by and allowed this to happen without lodging any protest. Yet, in the administrative hearing preceding the Commission's order, the parties considered the possibility of overtonnaging only with respect to Agreement No. 9929–2, which authorized the joint LASH and containerized cargo services. Proponents' brief (I J.A. 141, 144–61) and Hearing's Counsel's Brief (I J.A. 169, 175–76) addressed the issue of overtonnage only with respect to these two services. Even the ALJ in his Initial Decision addressed the issue of overtonnage and excess market power solely in terms of Agreement No. 9929–5. (II J.A. 195–98). *See* Brief for Sea-Land at 30–34.

On the other hand, the modification at issue is an exceedingly narrow one: by its terms it is merely a limitation on the amount of cargo ICT and CGM can carry pursuant to No. 10266–2. It is not easy to see how a limitation can *create* cargo capacity. We would think that, if No. 10266–2 did not create cargo capacity outright, the limitation would be a superfluous, but not threatening, addition to No. 10266–2.

Furthermore, this modification is of a different nature from the voting provision modification made in No. 10374. With respect to the voting provision, the Commission resurrected a provision which had been dropped from the agreement under consideration before the hearing, and one which was obviously a source of great controversy. But No. 10266–2, even in its first permutation, never contained any cargo capacity limitation, and the implications of No. 10266–2 regarding overtonnage were never discussed by the parties or the ALJ. Thus, it is unclear whether cargo capacity was far from the minds of the parties discussing the agreement, or whether it was so obviously a merely technical limitation that it was deemed unworthy of discussion or simply overlooked. Certainly it was never targeted as a major source of controversy requiring a hearing, unlike the multiple voting issue.

It is also undeniably true that No. 10266–2, although termed a Joint Marketing Agreement, nevertheless contained many of the indicia of a Joint Service. It may have been that the ALJ considered it as such; his statement at the outset of the Initial Decision that both Agreements (Nos. 9929–5 and 10266–2) were *per se* violations of *Svenska* could be taken to indicate this.

Thus, we find this a close question as to whether the Commission's changes in No. 10266–2 expanded the authority of the parties to the agreement. We recognize that, were the Commission's version of the facts true, this modification would amount to a mere restriction, constituting no more than a limitation on an otherwise unbounded car-

go capacity. But various factors, notably the proponents' unwillingness to accept this limitation and the placidity with which this agreement was received by Sea-Land below, make us hesitate to conclude, without more evidence, that Agreement No. 10266–2 was actually intended to create a new cargo capacity.

We think that our confusion is caused in large part by the absence of evidence from which we can determine that one or the other of the parties is correct in its assessment of the technical aspects of this agreement.[32] The ALJ and the parties never directly addressed the issue of cargo capacity inhering in Agreement No. 10266–2. We are left only with the Commission's version of the facts and applicable law, and no means of ascertaining whether these arguments control.

Thus, we have no alternative but to remand this issue along with the multiple voting provision. We emphasize to our earlier statement that the burden is on the Commission to demonstrate why this modification is clearly a restriction that requires no further opportunities for comment. Without at least a clear explanation from the Commission as to why this modification serves only to restrict the powers granted in No. 10266–2, we cannot assume that the Commission's failure to afford interested parties a further opportunity for comment was proper under Section 15. Therefore, we remand to allow such further notice and comment. At the very least, this further inquiry may reveal clearly why the Commission terms this modification a restriction of authority.

We vacate the Commission's order and remand the case for further hearing as to the addition of a multiple voting provision in No. 10374 and the addition of a cargo capacity limitation in No. 10266–3.

*It is so ordered.*

---

**32.** *See* text following note 27 *supra.*