MONSANTO COMPANY, Appellee,

v.

William RUCKELSHAUS, Administrator, Environmental Protection Agency, Appellant.

No. 84-1024.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1984.

Decided Jan. 24, 1985.

Rehearing and Rehearing En Banc Denied April 10, 1985.

1. Honorable James H. Meredith, United States District Judge for the Eastern District of Missouri.

John A. Bryson, Washington, D.C., for appellant.

Gary S. Dyer, Kansas City, Mo., for appellee.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, McMILLIAN, Circuit Judge.

McMILLIAN, Circuit Judge.

The Environmental Protection Agency (EPA) appeals from an order entered in the District Court for the Eastern District of Missouri granting permanent injunctive relief. The district court enjoined EPA and the Scientific Advisory Panel (SAP) from further consideration of a pesticide registration application submitted by an unidentified applicant until EPA discloses to Monsanto Co. the identity of the applicant and the active ingredient of the pesticide. Pursuant to a consent decree, EPA and Monsanto established the SAP and designated review by the SAP as a remedy to any competitive harm Monsanto may have suffered as a result of EPA's admittedly improper disclosure of certain information provided by Monsanto to EPA in connection with Monsanto's registration of its commercially successful herbicide Roundup. EPA argues that the district court improperly modified the terms of this consent decree in granting permanent injunctive relief because Monsanto had not met the heavy burden of showing the necessity of the modification. In addition, EPA argues that the district court misunderstood the nature of SAP review and ignored Monsanto's waiver of the information in the consent decree. Finally, EPA argues that the district court did not fully consider statutory provisions prohibiting disclosure by EPA of confidential information of reg-

istration applicants. For the reasons discussed below, we reverse the order of the district court.

This proceeding arose out of Monsanto's constitutional challenge [1] of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), as amended, 7 U.S.C. § 136 *et seq.* (1982). FIFRA authorized EPA to consider one company's submitted registration data in support of another company's registration application for a similar chemical, subject to certain restrictions.[2] During the pendency of Monsanto's constitutional action, the district court entered a pretrial order to protect Monsanto's registration application information from disclosure by EPA to other applicants. The order required EPA to give Monsanto sixty days notice and to disclose to Monsanto the identity of the entity seeking disclosure before EPA could disclose the information. FIFRA prohibits the disclosure of information that "contains or relates to trade secrets or commercial or financial information." *Id.* § 136h(b). Contrary to the district court's order and FIFRA, EPA disclosed confidential information submitted in connection with Monsanto's registration of its commercially successful herbicide Roundup to a Washington, D.C., attorney who had filed a request for the information under the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a) (1982). This disclosure was admittedly improper.

Monsanto then obtained an order from the district court requiring EPA to show cause why the court should not hold EPA in contempt. The district court ordered EPA to retrieve the improperly disclosed documents and also ordered the Washington attorney to return the documents and all copies of the documents. The attorney did so and submitted an affidavit attesting that neither he nor his client had retained any copies of the documents. In addition, the district court required the attorney to disclose the identity of his client. The attorney refused on the grounds of attorney-client privilege.

On August 31, 1982, after a period of negotiation, Monsanto and EPA entered into a consent decree, which the district court later approved and entered as a final

---

**1.** *Ruckelshaus v. Monsanto Co.,* — U.S. —, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

**2.** FIFRA is a chemical licensing, labelling, and regulatory statute. It prohibits any person from selling or distributing a pesticide that is not registered with EPA. 7 U.S.C. § 136a(a) (1982). The statute requires the applicant to submit test data supporting the environmental safety of the pesticide. In 1972, Congress authorized EPA to use one applicant's registration data to support another applicant's application. EPA could not, however, disclose the confidential trade secrets of one applicant to another applicant.

In 1978, Congress expanded the availability of submitted environmental safety data to support other applications. FIFRA no longer prohibited the use or disclosure of trade secrets, but made the data available on the basis of "age." Applicants who have submitted data after September 30, 1978, on a new active ingredient are afforded exclusive use for 10 years. *Id.* § 136a(c)(1)(D)(i). A new applicant or EPA may use data submitted after December 31, 1969, for 15 years if the applicant offers to compensate the original submitter of the data. *Id.* § 136a(c)(1)(D)(ii). Finally, data that does not qualify for either the 10 or 15 year period is available to EPA to consider without limitation.

Monsanto alleged that these provisions constituted an unconstitutional taking of property without paying just compensation. In addition, Monsanto urged that the data-consideration provisions violated the fifth amendment because EPA was taking the information for a private rather than public purpose. Finally, Monsanto contended that the statute violated its due process rights and constituted an unconstitutional delegation of judicial power.

The Supreme Court disagreed with Monsanto and upheld the constitutionality of the FIFRA data-consideration scheme. *Ruckelshaus v. Monsanto Co.,* — U.S. —, 104 S.Ct. 2862, 81 S.Ct. 815 (1984). The Court held that "to the extent that Monsanto has an interest in its health, safety, and environmental data cognizable as a trade-secret property right under Missouri law, that property right is protected by the Taking Clause of the Fifth Amendment." *Id.,* 104 S.Ct. at 2874. The statute, however, merely conditioned registration upon the future use of the data in consideration of other applications. Therefore, the statute did not undermine a "reasonable investment-backed expectation." *Id.* at 2875-79. The Court found an expressed and reasonable public purpose behind the data-consideration provisions. *Id.* at 2879-80. Congress believed these provisions would eliminate costly, duplicative research and thereby ease the entry into the pesticide market and stimulate competition. *Id.*

judgment. The consent decree established a remedy for any competitive harm Monsanto may have suffered as a result of EPA's improper disclosure of the Roundup information. The purpose of the agreement was to prevent EPA approval of registration applications for any pesticide that a new applicant may have developed through the use of Monsanto's confidential information about Roundup. The consent decree provided that EPA would screen all registration applications received after May 7, 1982, for products that have the same or similar active ingredient as that in Roundup. EPA would then divert all such registration applications to the SAP to determine "whether the materials submitted with the covered applications have been developed independently of the disclosed information." *Monsanto Co. v. Gorsuch*, No. 79–0366–C(1), slip op. at 2 (E.D.Mo. Aug. 31, 1982) (consent decree). Although EPA notified Monsanto when it diverted registration applications to the SAP and although Monsanto had the right to "make presentations" to the SAP, the consent judgment did not give Monsanto the right to a full-scale adversarial proceeding at which Monsanto could challenge the independent development of products diverted to the SAP review.

Importantly, Monsanto waived access "to the other's [the applicant who EPA had referred to SAP review] data or formula information without the other's consent." *Id.* at 3. Moreover, the consent decree expressly recognized that "all deliberations of the [SAP] shall be in executive session." *Id.* In other words, the SAP review was not to be open to the public or to the parties. The consent decree relied upon the SAP's independent judgment and expertise to determine whether the applicant developed the product independent of Monsanto's data and did not rely upon the parties' presentations to sharpen the issues.

According to the consent decree, if a majority of the SAP determined that the registration application contained only information that the applicant had developed independently of the improperly disclosed information, then EPA would "formally accept" the registration application and the normal registration process would proceed. *Id.* If the SAP found that any of the information in the registration application had not been developed independently, EPA would refuse to accept the registration application unless EPA determined that the SAP did not have sufficient information before it to support its conclusion. *Id.*

On August 22, 1983, EPA notified Monsanto that it had received a pesticide registration application for a product containing an active ingredient similar to that in Roundup and that, pursuant to the terms of the consent decree, it had referred the application to the SAP. Monsanto then requested EPA to disclose the identity of the applicant and the active ingredient to aid it in the development of its presentation to the SAP. Both EPA and the SAP refused this request, asserting that nondisclosure was necessary to maintain the confidentiality of the applicant under the consent decree and FIFRA. Monsanto then obtained a temporary restraining order (TRO) that prevented further consideration of the registration application by the SAP until EPA provided Monsanto with a "more appropriate and complete submission."[3]

Because the TRO did not specifically require EPA to disclose the identity of the applicant and the active ingredient and because the applicant asserted the confidentiality of such information, EPA determined that it would be premature to disclose the information. The district court then made the temporary order permanent, finding that EPA's refusal to disclose the requested information denied Monsanto

3. The district court stated that "Monsanto is at a distinct disadvantage in the proceeding because it does not know the identity of the applicant.... Further, Monsanto does not know what data has been submitted in support of the applicant's registration application." *Monsanto Co. v. Ruckelshaus*, Civ. No. 79–0366–C(1), slip op. at 3–4 (E.D.Mo. Oct. 14, 1983) (temporary restraining order).

due process. *Monsanto Co. v. Ruckelshaus,* No. 79-0366-C(1), slip op. at 6 (E.D.Mo. Nov. 2, 1983) (injunction). Although the district court's order did not specifically require EPA to disclose the applicant's identity and the active ingredient, the parties agree that in order to comply with the injunction EPA would have to disclose the registration application and supporting submission in a substantially unedited form.

*Modification of the Consent Decree*

■ The district court has inherent equitable powers to modify a consent decree, whether the parties entered into the decree after negotiation or litigation, upon a showing of changed circumstances which cause such extreme and unexpected hardship that the decree is oppressive. *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (*Swift*); *Humble Oil & Refining Co. v. American Oil Co.,* 405 F.2d 803, 813 (8th Cir.), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969). A court may modify the parties' rights and obligations under a consent decree if it finds that the judgment has become "void" or that it is "no longer equitable." Fed.R.Civ.P. 60(b)(4), (5). *See also United States v. Atlantic Refining Co.,* 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959) (modification of consent decree); *EEOC v. Safeway Stores, Inc.,* 611 F.2d 795, 798-99 (10th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980). Modification of a consent decree involves the granting of extraordinary relief. *See, e.g., Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1120-21 (3d Cir.1979). In addition to the power to modify the consent decree, a court has the power to interpret vague or confusing language to implement the purposes of the decree. *See Pasadena City Board of Education v. Spangler,* 427

U.S. 424, 438, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976); *Brown v. Neeb,* 644 F.2d 551, 559-60 (6th Cir.1981).

The consent decree between Monsanto and EPA neither required EPA to disclose the identity of the applicant and the active ingredient to Monsanto nor prohibited such a disclosure. The consent decree does allow Monsanto to make a presentation to the SAP, but it does not allow Monsanto access to the applicant's data or formula information. Moreover, Monsanto and EPA agreed that the SAP would conduct its review in executive session. The district court's injunction gives Monsanto access to the identity of the applicant and the active ingredient, which the consent decree neither required nor prohibited.

We could view the district court's injunction as a reasonable interpretation of Monsanto's right set forth in the consent decree to make a presentation to the SAP[4] or as a modification of the consent decree necessary to afford Monsanto due process. In either case, whether we characterize the order as an interpretation of ambiguous language or as a modification, the district court held that due process required EPA to disclose the identity of the applicant and the active ingredient to Monsanto. Therefore, we proceed to the due process issue.

*Due Process*

The due process clause requires that notice be reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests. In the administrative context, due process requires that interested parties be given a reasonable opportunity to know the claims of adverse parties and an opportunity to meet them. *North Alabama Express, Inc. v. United States,* 585 F.2d 783, 786 (5th Cir.1978) (citations omitted); *see Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed.

---

4. *See Sarabia v. Toledo Police Patrolman's Ass'n,* 601 F.2d 914 (6th Cir.1979). Despite the absence of any express authority, the court in *Sarabia* concluded that "it was within the power of the district court to suspend a civil service rule whose application prevented achievement of the stated goal of the consent decree." *Id.* at

918. In the present case, if the district court found that the EPA's refusal to disclose the identity of the applicant and the active ingredient frustrated the purpose of the consent decree, it could modify the original decree to effectuate its purpose.

1129 (1938) (*Morgan*); *United States Lines, Inc. v. Federal Maritime Comm'n,* 189 U.S.App.D.C. 361, 584 F.2d 519 (1978). Here, the district court found that due process requires "a reasonable opportunity to know the claims of the opposing parties and to meet them." *Monsanto Co. v. Ruckelshaus,* No. 79–0366–C(1), slip op. at 5 (order of Nov. 2, 1983), *citing Morgan,* 304 U.S. at 18, 58 S.Ct. at 776. Although the identity of the opposing parties and the nature of their claims is an essential element of due process in an adversarial administrative proceeding,[5] we believe that the district court misconceived the nature of the consent decree and frustrated its purpose by imposing such a requirement in this case.

■ Parties may waive rights afforded them under the due process clause. *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972); *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 414–15, 11 L.Ed.2d 354 (1964). Parties to a consent decree may waive their right to litigate the particular issues raised. *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). While there is a presumption against waiver of due process, *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), courts look to the nature and purpose of a consent judgment when determining what procedures are necessary to effectuate their purpose and to comport with due process.

■ In this case, the parties did not design the SAP review to be an adversarial proceeding. The consent decree did not provide that Monsanto could contest before the SAP the independent development of an applicant's product or that the registration applicants would "defend" charges that the registration application was not the product of independent development. Rather, the SAP review was designed as an independent and specialized administrative inquiry. Monsanto and EPA agreed to rely upon the SAP's expertise to determine whether the registration applicant had developed its registration application and supporting data independently of Monsanto's Roundup data.

In addition, the SAP review does not impair Monsanto's property interest in the data required to be submitted to EPA under FIFRA. *See Ruckelshaus v. Monsanto Co.,* 104 S.Ct. at 2875–80. Under the consent decree, SAP review determines whether the registration applicant developed the registration application and supporting data independently of Monsanto's Roundup data for purposes of EPA's acceptance of the registration application for the new product. If the SAP review determines that the registration applicant did not develop the registration application and data independently, then EPA will not accept the registration application and, therefore, the SAP prevents the registration applicant from profiting from the EPA's improper disclosure of Monsanto's confidential information about Roundup. If, however, the SAP finds that the registration application was independently developed, then Monsanto's confidential Roundup data are not involved and EPA can then accept the registration application. The SAP review is not designed as a judicial or adversarial administrative proceeding to determine whether the registration applicant misappropriated Monsanto's trade secrets. The SAP review, therefore, does not impair Monsanto's property interest; rather, it is a screening mechanism designed to prevent a competitive harm to Monsanto. Importantly, the registration applicant whose registration application has been referred to the SAP review is not an opposing or adverse party to Monsanto in the context of the SAP review. The applicant has submitted a registration application for a prod-

---

5. The cases that the district court relied upon and that Monsanto cites to this court were all adversarial proceedings. *See, e.g., Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938) (order of Secretary of Agriculture fixing maximum rates of commission at stockyards); *North Ala. Exp., Inc. v. United States,* 585 F.2d 783 (5th Cir.1978) (ICC increased operating authority to motor common carrier).

uct that contains an active ingredient similar to the active ingredient in Roundup. The SAP review determines only whether the registration application and data were developed independently of Monsanto's confidential Roundup data for purposes of registration under FIFRA.

Monsanto asserts that if it knew the identity of the registrant and the active ingredient in the new product, it could search the public record to determine whether the applicant had been conducting research and product development in the particular area of that new product. While Monsanto might be disadvantaged to an extent, nevertheless EPA and Monsanto designated the SAP to conduct an inquiry which presumably would include the same inquiry about the product as Monsanto might make. Monsanto is not limited in the suggestions it may make to SAP on methodology to ascertain whether or not the applicant's product has been derived from independent research, rather than from acquisition of confidential material indirectly obtained through Monsanto.

While Monsanto's presentation to the SAP may be limited, nevertheless it has agreed to rely on the integrity of SAP to assure that the applicant has proceeded independently in developing the new processes. Under these special circumstances, Monsanto's objection based on due process considerations must be rejected. Monsanto makes no showing that in exercising its expertise SAP will not make an appropriate investigation, an investigation that will protect Monsanto's interests. Moreover, as indicated, *supra*, we are dealing only with a screening mechanism designed to prevent competitive harm to Monsanto; Monsanto

may still challenge the propriety of the registration in administrative proceedings, if the SAP review decides that registration may proceed.

*Confidentiality*

■ EPA also argues that it is prohibited under FIFRA from prematurely disclosing the identity of the registration applicant and the active ingredient when disclosure would result in unforeseen competitive harm to the registration applicant. 7 U.S.C. § 136h(b).[6] Monsanto argues that the information is not confidential and, therefore, in fact, not protected from disclosure by the EPA, and that FIFRA requires EPA to disclose the identity of the registration applicant and the active ingredient.

FIFRA requires EPA to publish in the Federal Register upon receipt of the registration application the name of the registration applicant and the identity of the pesticide when the pesticide contains a new active ingredient or if it requires a changed use pattern. 7 U.S.C. § 136a(c)(4). EPA acknowledges that in the present case the registration applicant's pesticide contains a new active ingredient and that, if EPA had "formally accepted" the registration application, the statute would require publication in the Federal Register of the registration applicant's identity and active ingredient. EPA contends, however, that a registration application which has been referred to the SAP review process pursuant to the terms of the consent decree will not be "formally accepted" until the SAP determines that the registration application and supporting data were developed independently of Monsanto's improperly disclosed data.

---

**6.** Section 10(b) of the 1972 amendments, 7 U.S.C. § 136h(b), prohibits EPA from publicly disclosing information which EPA believes contains or is related to "trade secrets or commercial or financial information." As noted in *Ruckelshaus v. Monsanto Co.,* 104 S.Ct. at 2869, the 1978 amendments revised FIFRA's data-consideration and data-disclosure provisions.

Congress added a new subsection, § 10(d), 7 U.S.C. § 136h(d), that provides for disclosure of all health, safety, and environmental data to qualified requesters, notwithstanding the

prohibition against disclosure of trade secrets contained in § 10(b) [, 7 U.S.C. § 136h(b) ]. The provision, however, does not authorize disclosure of information that would reveal "manufacturing or quality control processes" or certain details about deliberately added inert ingredients unless "the Administrator has first determined that the disclosure is necessary to protect against an unreasonable risk of injury to health or the environment." §§ 10(d)(1)(A) to (C).

*Id.* at 2869–70 (footnote omitted).

The SAP review process was designed to prevent the acceptance of a registration application for a pesticide developed with improperly disclosed data. EPA, therefore, agreed not to "formally accept" a registration application for a pesticide containing similar active ingredients to Roundup until the SAP determined that the registration application in question was developed independently of the improperly disclosed data. *Monsanto v. Gorsuch*, No. 79–0366–C(1), slip op. at 2 (E.D.Mo. Aug. 31, 1982) (consent decree). In other words, EPA agreed to subject a potentially innocent class of new pesticide registration applications to the additional procedural step of a SAP review to prevent any competitive harm to Monsanto from EPA's improper disclosure. Monsanto agreed that EPA would not "formally accept" registration applications which had been referred to the SAP until the SAP determined that the registration application was developed independently of the Roundup data. EPA is under no statutory duty to publish the identity of the registration applicant and the active ingredient in the Federal Register until the registration application is cleared by the SAP review and thus accepted for registration. Premature disclosure of the identity of the registration applicant and the active ingredient may expose the registration applicant to substantial and unanticipated risk of competitive harm. Moreover, the consent decree contemplated that the SAP would hold its review in executive session in order to protect Monsanto's and the registration applicant's trade secrets.

Accordingly, the order of the district court is reversed.

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent from the majority's opinion because I think the majority has misinterpreted the district court's order and frustrated the purpose of the consent decree. Although it is not clear whether the majority views the district court's opinion as an interpretation or a modification of the consent decree, *see supra* at 653–54,

the opinion impliedly treats the decision as a modification of the decree. This treatment is unwarranted.

First, Monsanto did not present the district court with a motion to modify the consent decree. *See* Fed.R.Civ.P. 60. Rather, Monsanto presented the district court with a motion to restrain the Scientific Advisory Panel (SAP) from consideration of applications, and to enforce the terms of the decree as Monsanto understood them. Consequently, the order entered by the district court did not modify the decree, it enforced the decree. Thus, I believe that the majority erred in misapprehending the import of the district court's order.

Second, I believe the district court interpreted and enforced the decree properly. Between the parties, a consent decree is conclusive as to its contents. *Star Bedding Co. v. Englander Co.*, 239 F.2d 537, 541 (8th Cir.1957). For purposes of enforcement, consent decrees are to be construed as contracts. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *Brown v. Neeb*, 644 F.2d 551, 562 (6th Cir.1981). Further, the scope of a consent decree is to be discerned from what appears within its four corners, and not by reference to what might satisfy the purposes of one of the parties to the decree. *Firefighters Local 1784 v. Stotts*, — U.S. —, —, 104 S.Ct. 2576, 2586, 81 L.Ed.2d 483 (1984). *ITT Continental*, 420 U.S. at 233, 95 S.Ct. at 932, *quoting, United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *United States v. Beatrice Foods Co.*, 493 F.2d 1259, 1264 (8th Cir.1974).

Because a consent decree is to be construed as a contract, reliance upon certain aids to construction is proper.

Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule. . . .

*ITT Continental,* 420 U.S. at 238, 95 S.Ct. at 935; *see also Brown,* 644 F.2d at 562. Even if a district court fails to retain jurisdiction explicitly, as it did here, the court has the inherent power to enforce agreements entered into in settlement of litigation pending before it. *Sarabia v. Toledo Police Patrolman's Ass'n,* 601 F.2d 914, 917–18 (6th Cir.1979), *quoting, Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1371 (6th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). "It is also clear that the enforcing court has the power to interpret a decree when its language results in confusion." *EEOC v. Safeway Stores, Inc.,* 611 F.2d 795, 798 (10th Cir. 1979). Finally, as the majority notes, the consent decree in this case was intended to be a remedy. *See supra* at 651–52.

The most significant part of the consent decree, for purposes of this case, is the provision which allows Monsanto to "make presentations to the Panel and answer any inquiries put by the Panel...." Record at 107. This litigation centers around what the parties meant by "make presentations." I think the district court's due process discussion referred to what the parties intended by providing Monsanto with an opportunity to make a presentation before the SAP. It was not, as it is construed by the majority, a separate basis for the district court's order. The due process discussion was directly related to Monsanto's right under the consent decree not just to a presentation, but to an effective presentation. This is not to say that Monsanto was entitled to an adversarial hearing. However, Monsanto has never argued for an adversarial hearing, nor does the district court's order demand that one be held.

The district court simply ordered that Monsanto be given the information it needed to make the type of presentation the parties had contemplated when they entered into the consent decree.

It is true that by entering into the consent decree Monsanto waived whatever due process right it may have had to sue the EPA for its negligent, administrative mistake. However, Monsanto did not waive the privilege of actively participating in the process intended to mitigate the damage caused by the EPA's negligence, for the consent decree specifically states that Monsanto has the right to make presentations. The issue is what the parties intended these presentations to entail. Certainly it is not unreasonable to assume that Monsanto was to be given the opportunity to make meaningful presentations.

It is helpful to remember that, by negligently disclosing trade secrets belonging to Monsanto, the EPA set the stage for a situation which might result in a severe financial loss for Monsanto. To mitigate this loss, and presumably to mitigate or avoid EPA liability for the loss, the parties entered into a consent decree. The consent decree requires the EPA to identify for SAP review any application which contains: one of two active ingredients; one of six derivatives from each of those active ingredients; or any combination of those six derivatives when the data is submitted in any of three subject areas. Monsanto contends that it needs to know the active ingredient relied on in the product application and the name of the applicant in order to make a presentation.[1] The EPA contends

---

1. The district court's order required the EPA to disclose to Monsanto the applicant's submission regarding the independent development of the product, "having deleted all confidential formula information and research and test data submitted to defendant which is normally required by defendant of an application for a pesticide registration...." The parties appear to agree that, when distilled, the district court's order requires the EPA to give Monsanto the name of the active ingredient and applicant in any relevant application. Thus, I disagree with the majority's conclusion that the district court's order required the EPA to "disclose the registration

application and supporting submission in a substantially unedited form." *Supra* at 653. The regulations governing applications require much more information than an applicant's name and the name of the active ingredient in a product. *See generally* 40 C.F.R. §§ 162.6— 162.10 (1984). Yet disclosure requirements only apply to an applicant's name and the active ingredient in a product. 40 C.F.R. § 162.6(b)(6) (1984). The submission referred to in the district court's order is a statement submitted by the applicant which is to address whether the applicant obtained its product through indepen-

that Monsanto is not entitled to any information regarding an application.

If the EPA's contention is to be accepted, as it is by the majority, then in order to have a meaningful presentation before the SAP Monsanto must explore the *entire* universe of each of the protected active ingredients, each derivative of those ingredients, and/or every combination of those derivatives, as they might apply to any one of three distinct subject areas. At best, a presentation of this nature would be quite lengthy and would contain a great deal of irrelevant information as far as any one application is concerned. This type of presentation, the logical result of the majority's decision, is absurd and it may not be possible to make such a presentation. Further, if the consent decree intended to provide for this type of presentation, there would be no need for more than one presentation by Monsanto. Yet the language of the consent decree clearly provides for an individualized presentation on each subject application.

The result becomes only more absurd when one looks at the information Monsanto would have been entitled to by law had the consent decree never been entered into. Under the regulations governing applications for the registration of a product, the EPA is required to publish upon *receipt* of the application the applicant's name and the product's active ingredient.[2] After publication, Monsanto or any other party, would have had by law the right to comment on the application within thirty days. 40 C.F.R. § 162.6(b)(6) (1984). Presumably, if Monsanto could show that an applicant relied on trade secrets misappropriated

from Monsanto, approval of the application would be postponed if not denied. Under the majority's interpretation of the consent decree, Monsanto has less information than it would have been entitled to prior to the decree,[3] and the "remedy" supposedly contained in the decree is illusory. This, from a decree which was necessary initially because of the EPA's negligence.

More importantly, under the majority's interpretation Monsanto is deprived of the information it needs to make an effective presentation. Thus, the consent decree may as well not contain the presentation provision because it is rendered meaningless. While the majority's decision protects the EPA, it certainly does not do justice to the language of the consent decree agreed on by the parties, nor does it ameliorate the impact of EPA's misconduct or negligence.

Third, the flaw in the majority opinion, which makes this interpretation of the consent decree possible, is the majority's acceptance of the EPA's arguments which, at bottom, are disingenuous. In one breath the government argues that it has not "formally accepted" any application referred to the SAP. Thus, any such application has not been received and the publication requirements of FIFRA are inapplicable. In the next breath, as justification for not giving Monsanto the information it has requested, the EPA invokes the confidentiality provisions of FIFRA.

I would agree with the majority and the EPA in one respect: the SAP was set up as a screening device and, as a result, the publication provisions of FIFRA should not apply. However, I would go one step fur-

---

dent research or obtained the product by misappropriating Monsanto trade secrets. *See* Record at 128 (memo from Director of Pesticide Programs to the SAP, detailing SAP's responsibilities). Thus, it is safe to assume that the submission will contain more data than the product's active ingredient and the applicant's name. Contrary to the majority's inference, Monsanto was not to receive a great deal of information under the district court's order; it simply was to receive significant information.

**2.** The regulations do not require disclosure of an applicant's formula or data information, but

neither does the consent decree nor the district court's order. Apparently, the name of the active ingredient is not considered to be part of the protected information, i.e., the formula and data information.

**3.** It is true, however, that under the district court's interpretation of the consent decree Monsanto would be the only party privy to the applicant's name and the product's active ingredient, while under the regulations Monsanto would have to share this information with the public at large.

ther and hold that the confidentiality provisions of FIFRA should not apply either. The EPA wants to relieve itself of liability for the negligent disclosure of Monsanto trade secrets and, because the EPA is afraid that Monsanto will misappropriate the information it obtains in the SAP review process, it wants to insulate itself from further liability by not divulging any information to Monsanto. *See* (Final Confidentiality Determination by the EPA). Record at 143, 149–51. I agree that the EPA is in an uncomfortable position. Nevertheless, it is in a situation of its own making. Perhaps the consent decree does not offer adequate protection to the EPA and applications referred to the SAP. However, the EPA should not now be allowed to adopt a strained interpretation of the consent decree, which deprives Monsanto of its remedy, simply because it failed to guarantee that adequate safeguards against disclosure by Monsanto existed in the decree. Courts of law should be in the business of enforcing consent decrees to effectuate their intent, not in the business of rendering consent decrees meaningless when one party to a decree fails to protect its interest adequately.

Finally, the majority's analysis of the problem presented in this case is flawed because the majority assumes the integrity of all applicants whose applications are referred to the SAP. While most applicants can be assumed to have integrity, there will most likely be one applicant who has none; hence the need for the consent decree. The party who obtained Monsanto's trade secrets from the EPA clearly knows that this information was misappropriated. Both parties to this proceeding obviously believed that whoever obtained the protected information would try to use it, or the screening procedure never would have been established. Further, all applicants are put on notice that they must submit data which demonstrates that their products are the result of independent research and not the result of misappropriated information. Under these circumstances, it is not far-fetched to believe that whoever obtained this information will utilize all devices and skills available to get an application past this screening device.

I agree with the majority's conclusion that the presentations before the SAP were not intended to be adversarial in nature. However, I think the majority errs in concluding further that if they are non-adversarial then the decree didn't intend the SAP to rely on the presentations to help sharpen the issues before the SAP, and help ferret out the wrongdoer. The very existence of a provision for presentations allows for a contrary conclusion. Without the aid of these presentations, the SAP may not be able to fulfill its function. There is no evidence anywhere in the record to indicate that, absent a meaningful presentation by Monsanto, the SAP has sufficient information or expertise to see through a bogus application. Yet, under the majority's interpretation of the decree, Monsanto does not have even an opportunity to make a presentation regarding the relevant active ingredient and what research or data must support a particular active ingredient. Nor does Monsanto have the opportunity to inform the SAP that the disclosed information would have been of no value to a particular applicant, a determination Monsanto should be able to make readily given the proper information. *See* Record at 129–31. (Letter from Monsanto's counsel to EPA counsel).

In sum, the point is that the EPA and Monsanto entered into a consent decree before a court which was intimately familiar with the complex litigation before it. Given this familiarity, the evidence of record, the circumstances surrounding the decree, and the very language of the decree, the district court's interpretation of the decree was eminently reasonable. The majority simply disagrees with this interpretation, but in so doing I do not believe that the majority gives the district court's decision the deference it deserves. "Few persons are in a better position to understand the meaning of a consent decree than the judge who oversaw and approved it." *Brown*, 644 F.2d at 558 n. 12. Further, even if the majority's disregard of the dis-

trict court's decision could be justified, the majority's opinion defeats the purpose of the consent decree, which was to afford Monsanto a remedy. Monsanto is deprived of being an active participant in mitigating the harm wrought by the EPA's negligence because the presentations are meaningless. Because the presentations are, in effect, meaningless, there is no guarantee that SAP will be able to screen out the applicant who relies on trade secrets misappropriated from Monsanto. It is inconceivable to think that Monsanto could have petitioned the court for, and entered into an agreement which intended this result. Thus, I respectfully dissent.